FRASER BRICK CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 12028. Promulgated March 9, 1928.

*J. M. McMillin, Esq.*, for the petitioner.
*Granville S. Borden, Esq.*, for the respondent.

MILLIKEN: The principal issue relates to the claim for a paid-in surplus in the amount of $84,446.53. No question is involved concerning the right to the same for the years in question. We are concerned with only the amount. Respondent in his determination has allowed a paid-in surplus in the amount of $34,210.

The respondent as a basis for his action resorted to the sale in 1912 by one of the partners of a 47½ per cent interest as establishing the actual cash value of the assets acquired by petitioner at date of incorporation. Such a sale standing alone would no doubt be a sufficient index to support the conclusion reached. Petitioner, however, placed both Fraser and Myers on the witness stand and their testimony reveals that the sale was akin to a forced sale and quite without regard to the real value of the assets involved. Myers did not desire to continue in the business and was prepared to and did offer his interest to his relative and co-partner at a price below its actual cash value. Prior to his connection with the partnership he was engaged in the newspaper business and desired to return thereto. In 1912 he had found such an opportunity requiring capital and he made an offer to sell to Fraser his interest, which was promptly accepted without further negotiations; Myers being

satisfied with a quick sale and Fraser accepting what he considered a bargain. Testimony was also introduced concerning the actual cash value of each of the assets.

An examination of the balance sheet of the petitioner of September 1, 1912, shows that it had in bank $4,044.29 and cash at its manufacturing plant of $58.50. These items were clearly worth par and were allowed by the respondent.

The brick stock account or inventory showed manufactured products on hand of the value of $17,138.86. The evidence is to the effect that this stock was inventoried at cost, and that the fair market price or value was perhaps 25 per cent in excess of same. The respondent allowed this item in the amount of $17,138.86, which we think was correct and his action is approved.

Water supply was set up at $3,536.09. This consisted of a deep well costing $1,600, pump, pipes and lines to dwelling houses and manufacturing plant, comprising a water works system essential to the carrying on of the business of the petitioner and for the comfort of its employees. The president of the petitioner testified that the cost of said system was $3,536.09, that it had been kept in the best of condition by repairs and replacements, and that its actual cash value was $3,536.09. This should be allowed in full.

Expenditures for stiff mud plant $75, and for office furniture $828.44, should be allowed in full, as should also accounts receivable $26,227.12, as the evidence showed all accounts were collected in full and were worth the face amount on September 1, 1912.

Deductions made by the respondent were mainly as follows: Property account from $8,433.55 to $3,354.78; property development from $6,031.28 to $2,399.18; houses from $9,877.07 to $3,929.00, and brick plant construction account from $61,628.89 to $24,514.84. The evidence of record does not support the action of the respondent concerning the values so determined.

Relative to the property account of $8,433.55, it appears from the evidence that the petitioner's predecessor purchased 181 acres of land in 1905 for $8,433.55 and it has been carried on the books ever since at the original cost, which is $46.55 per acre. It is shown in the evidence that this land is underlaid by clay beds of fine quality of an average thickness of 14 feet, running about 27,000 tons per acre of the value of 2 cents per ton, or $540 per acre. There is other evidence to the effect that this land on September 1, 1912, had a fair market value of $250 per acre. In view of the same, we must disapprove the respondent's determination on this item and hold that the property account should be allowed in full.

The property development account of $6,031.28 represents a $3,020 expenditure for a steam shovel 10½ months before the incorporation of the petitioner, five-eighths of a mile of railroad rails, ties and switches, and small tool houses.

The items of this account were put down at cost and according to the only evidence relative thereto the railroad switch and steam shovel were kept in the very best of condition, and at the date of incorporation were of the actual cash value carried on the books. The respondent only allowed $2,399.18 on this account, which is $620.82 less than the cost of the steam shovel alone which had been purchased only a short while before the incorporation. This account should be allowed in full.

The houses account of $9,877.07 was reduced by the respondent to $3,929. It appears from the evidence that in order to furnish living quarters for its employees, petitioner's predecessor built 34 frame residences with brick foundations, and a brick store. The residences were of two, three and four rooms. The average cost was $282 and the actual cost only was carried on the books. The Federal Trade Commission in making an audit and examination of the petitioner in 1918 fixed the cost of these houses at $11,784.95. In view of all the evidence we think that $9,877.07 is a very conservative charge for these houses and this should be allowed without reduction.

The remaining account is that of brick plant construction, $61,628.89, which comprised the power plant consisting of boiler, engine, pumps, water heater, the dry press brick plant, eight kilns, oil burning equipment, factory buildings and other miscellaneous facilities. The principal item in this account is the dry press brick plant $40,434.29. It appears from the evidence that only the actual cost of the items comprising this account was charged and that the values fixed were very conservative. Our opinion is that this also should be allowed in full.

The controversy concerning depreciation relates to the basis for the computation rather than the rate. Petitioner accepts the rate determined and used by respondent in the determination of the deficiencies for the years in question. We find no occasion to change the rate. Invested capital and deductions for depreciation should be computed in accordance with the basis set forth in our findings of fact.

The petitioner and its predecessor used in the manufacture of brick what is known in the record as the " Dry Press Brick Plant." Owing to a change in business demands and methods of manufacture the use of this plant was discontinued in 1918, and it was replaced

by different and more modern machinery and methods. It was not junked but remained standing on the company's grounds. The respondent contends that deduction therefor should be made from the gross income for 1918, while the petitioner submits that 25 per cent thereof should be deducted yearly for the years 1918, 1919, 1920 and 1921. It is significant that, in making its return for 1918, petitioner stated that the dry press brick plant had been abandoned and scrapped. Based upon the evidence we are satisfied that the loss occurred in the year 1918, and the respondent's action is approved. *Dilling Cotton Mills*, 2 B. T. A. 127.

In August, 1917, the Tennessee Farm Dairy, a corporation, entered into a contract with the Dallas Paving Co., a corporation, for the construction by the latter of a large silo upon the property of the former. The petitioner was to furnish the necessary brick and as security the Tennessee Farm Dairy required the petitioner to guarantee the silo for a period of ten years against defects resulting from faulty design, workmanship or material used therein, which the petitioner did.

When the silo was first filled with silage in the early fall of 1917, the silo collapsed, causing great damage to the silo and its contents of 850 tons. The petitioner admitted its liability, but as the exact amount of damage could not be immediately ascertained, it estimated that its possible liability was $4,000, which it entered on its books as such during 1917. Before the close of the year 1917, it ascertained that the Dallas Paving Co. was hopelessly insolvent, its claim against the Paving Co. worthless and it therefore charged off the item as a loss in and for 1917.

The loss was actually settled in June, 1918, by the petitioner paying the Tennessee Farm Dairy $3,000, with no reimbursement from the Dallas Paving Co.

The Commissioner insists that the loss should be deducted from 1918 income, while the petitioner contends that it is entitled to the deduction from 1917 income. We are of the opinion that the facts of this case bring it within the rule laid down in *Producers Fuel Co.*, 1 B. T. A. 202, that the petitioner is right and that the deduction should be allowed from 1917 income, but for only $3,000, the amount actually paid.

*Judgment will be entered on 15 days' notice, under Rule 50.*