FIFTH AVENUE COACH LINES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 61646. Filed February 27, 1959.

*Paul R. Russell, Esq.*, and *Lloyd I. Paperno, Esq.*, for the petitioner.
*William T. Holloran, Esq.*, and *Paul D. Barker, Esq.*, for the respondent.

TRAIN, *Judge:* The respondent determined deficiencies in the petitioner's income and excess profits taxes for the years and in the amounts as follows:

| Year | Tax | Deficiency |
|---|---|---|
| 1943 | Income | $50,410.12 |
| 1943 | Excess profits | 18,556.06 |
| 1944 | Income | 239,430.21 |
| 1945 | Income | 190,512.50 |
| 1946 | Income | 184,481.18 |
| 1947 | Income | 73,379.29 |

The issues to be decided are:

(1) Whether the petitioner is entitled to deductions for the taxable years 1944 through 1948 for payments made to the widow of a deceased former officer, in the amount of $7,500 per annum, as further compensation for past services rendered by that official;

(2) Whether petitioner is entitled to deduct in 1946 and 1948 wages for services rendered by employees in those years in the amounts of $83,226.52 and $112,600, respectively, the amount of $83,226.52 being finally determined by arbitration in 1947, and the amount of $112,600 being finally determined by arbitration in 1949;

(3) Whether petitioner is entitled to a deduction in 1948 for interest in the amount of $109,802.30 on tax deficiencies for the years 1943 through 1947 resulting from a decision of this Court involving prior years, and which had not become final by the end of the taxable year 1948.

The assignments of error contained in the petition concerning excess profits credit carrybacks and operating loss carrybacks will be disposed of as stipulated by the parties.

No deficiencies were determined for the taxable year 1948 and any consideration herein of facts relating to that year is made only as is

necessary to determine correctly the deficiencies for the years which are before the Court. Sec. 272(g), I.R.C. 1939.[1]

### FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

The petitioner is a corporation organized and existing under the laws of the State of New York and has its principal office in New York City. It filed its income and excess profits tax returns for the years 1943 through 1948 on a calendar year accrual basis with the collector of internal revenue for the third district of New York.

The petitioner's history is set forth in detail in *New York City Omnibus Corporation*, a Memorandum Opinion of this Court dated November 30, 1948, incorporated into these findings by stipulation and will only be summarized briefly here. Petitioner's history began in 1925 with the Manhattan Surface Coach Company, which merged with the New York City Omnibus Corporation in 1930, the petitioner being known by the latter name until May 1956. The New York City Omnibus Corporation (hereinafter sometimes referred to as Omnibus) was a subsidiary of New York Railways Corporation, incorporated in 1925 (hereinafter referred to as Railways). In 1926, all of Railway's capital stock was acquired by Fifth Avenue Coach Company, organized in 1896. Through transactions not here relevant, Railways became the operating company of an integrated street railway system in the Borough of Manhattan under city franchises.

In 1936, Railways was reorganized under section 77B of the Bankruptcy Act. The reorganization was virtually consummated on December 24, 1936, when Omnibus, upon being recapitalized, transferred its stock to Railways in exchange for all the properties and assets of Railways. The reorganization was finally terminated on July 23, 1937, by the entry of an appropriate order of the District Court.

The petitioner, therefore, is the successor of several corporations which had previously engaged in street railway transportation in Manhattan. It commenced operating motor coaches in 1936 over routes upon which the predecessor street railway corporations had operated streetcars.

### Issue 1.

Hugh J. Sheeran (hereinafter referred to as Sheeran), the then president and a member of the board of directors of the petitioner, died on February 24, 1938, at the age of 53. He had been an officer of the petitioner or its predecessors since 1933. His career began in

---

[1] All references to sections are to the Internal Revenue Code of 1939 unless otherwise indicated.

1900 when he started as a clerk with the Metropolitan Street Railway Company. In 1924, Sheeran succeeded Joe E. Hedges as the receiver of the New York Railways Company; this company was reorganized as Railways in 1925, at which time Sheeran was elected its president. In 1925, Sheeran was also elected president of Manhattan Surface Coach Company, formed for the purpose of making applications for bus franchises, and which in 1930 changed its name to New York City Omnibus Corporation.

From 1925 through 1933, Sheeran worked actively with John A. Ritchie, president of the Fifth Avenue Coach Company (not the petitioner here) and the Chicago Motor Coach Company, on the procuring of bus franchises from the City of New York to replace the existing street railway franchises. As a result of their efforts, the negotiations with the City of New York culminated successfully in 1933 in the acquisition of franchises to operate motor buses over the routes formerly served by the predecessor street railway companies. Sheeran continued in office during the difficult period while motorization of the street railway lines was being completed. He played a prominent role in and was given great credit for the success of the negotiations and subsequent motorization.

Sheeran was also appointed the president of Madison Avenue Coach Company in 1933 and Eighth Avenue Coach Company in 1935, two corporations which commenced bus operations in 1935 and became subsidiaries of Omnibus under the reorganization in 1936.

New York Railways Corporation operated at a loss, consistently, from 1927 to 1935, as follows:

| | | | |
|---|---|---|---|
| 1927 | $1,042,816.06 | 1932 | $1,283,283.94 |
| 1928 | 1,079,071.49 | 1933 | 1,202,902.65 |
| 1929 | 1,359,233.99 | 1934 | 947,287.70 |
| 1930 | 1,436,422.81 | 1935 | 1,290,010.24 |
| 1931 | 974,700.94 | | |

Petitioner, as motorized bus service gradually replaced street railway operations during the 5 months from February to June 1936, operated profitably, even during the year in which the change was effected, as follows:

| | |
|---|---|
| 1936 | $576,752.39 |
| 1937 | 1,824,447.70 |
| 1938 | 2,214,117.84 |

From May 1925 to November 1937, Sheeran's salary as president of the petitioner was $28,500 per annum. In November 1937, it was increased to $35,000 and remained at that figure until his death 4 months later. Sheeran devoted his full time to the petitioner and its affiliates.

Services rendered by employees of petitioner for the predecessor street railway companies were treated as services for petitioner in determining seniority privileges.

After Sheeran's death on February 24, 1938, his widow was left with four children of school age to support. At a meeting of the board of directors of petitioner held on March 7, 1938, it was resolved that Sheeran's salary of $35,000 per annum be continued "by making monthly payments to Mrs. Sheeran beginning with the month of March and extending through the month of June 1938, and thereafter to make monthly payments to Mrs. Sheeran at the rate of $7,500 per annum," such payments to continue until other action was taken. The minutes of that meeting disclose that the chairman suggested that the board consider "what action should be taken in regard to making provision for aiding in the support of the wife and four children" of Sheeran, explained that Sheeran's estate would realize only a nominal amount, and informed the board of the amount of life insurance Sheeran's widow would receive. The chairman further stated that Sheeran's salary:

had continued without increase through the years when he was called upon to perform services of extraordinary character in connection with bringing about the motorization of the street railway lines and that it was not until November 1, 1937, some time after the successful completion of motorization, that his salary had been increased to $35,000. per annum; that Mr. Sheeran had performed services * * * which both in extent and in quality had gone far beyond the services which were necessary or required in the ordinary course of the performance of his stipulated duties as President, and that it was believed that his ill health in recent years and his fatal illness were in large part attributable to his complete dedication of himself to his work on behalf of the Corporation * * *

In making these provisions to aid in the support of Sheeran's widow and her four children, the board noted the practice of other corporations in this regard and the possible effect on the morale and incentive of other executives. At the meeting on June 7, 1938, the shareholders, by a great majority, approved the action of the board authorizing the payments. The petitioner made the payments to Sheeran's widow as authorized by the resolution of the board of directors and continued to make such payments through the years here involved. The total payments to Sheeran's widow to the end of 1948 aggregated $90,416.

Upon Sheeran's death in 1938, John A. Ritchie succeeded him as president of the petitioner and received a salary from that company of $22,500. Ritchie drew further salaries from related companies for a total compensation of approximately $72,520 per year. Prior to Sheeran's death, Ritchie had been receiving $10,000 per annum from petitioner. Later in 1938, J. E. McCarthy succeeded to the

position of president of the petitioner and took over all the prior duties and responsibilities of Sheeran including the presidency of Eighth Avenue Coach Corporation and Madison Avenue Coach Company. McCarthy devoted only about 70 per cent of his time to the petitioner and its subsidiaries. When McCarthy and Ritchie took office, the acquisition of the franchises and the motorization of the lines had been successfully completed and the new bus operations had been placed upon a very profitable basis. McCarthy's salary from these positions during the years 1941 to 1947 was as follows:

| | | |
|---|---|---|
| 1941 _____ $14,000.00 | 1945 _____ $23,146.65 |
| 1942 _____ 17,500.00 | 1946 _____ (¹) |
| 1943 _____ 19,600.00 | 1947 _____ 28,000.00 |
| 1944 _____ 21,700.00 | |

¹ Not available.

This compensation represented 70 per cent of the total salary received by J. E. McCarthy during these years. The other 30 per cent was received from Fifth Avenue Coach Company, another New York City transit company and not the petitioner herein, where he continued as vice president and general manager. McCarthy's salary from all these companies was lower in 1938 than it was in 1941. McCarthy had not been employed by the petitioner or its subsidiaries prior to 1938; he had previously worked with the Fifth Avenue Coach Company. Wood, president of Fifth Avenue Coach Company, was receiving a salary of $36,000 per annum in 1927. He devoted his full time to the company.

From 1935 through 1938, Huff was the president of Third Avenue Railway System, another New York City street railway transit company comparable in size to the petitioner. During those years, Huff received a salary of $60,000 per annum; Davison, the officer second in authority, received $45,000 yearly.

Neither the petitioner nor its predecessors had any set policy as to whether or not payments would be made to a surviving widow of a former officer. Each such case was decided as the issue arose. Two other officers of the petitioner, E. C. Collins, secretary and treasurer, and T. G. Walker, assistant secretary and assistant treasurer, have died since Sheeran's death. Collins' widow received payments equal to her husband's salary for 9 months. Collins had been ill and shortly before his death had received a full salary for a period of 27 months during which he did not work. Collins' length of service with petitioner was much shorter than that of Sheeran's. Walker's widow received a payment equal to her husband's salary for a "very short period of time." Walker had died at the age of 65, his retirement age under the terms of his employment contract, and his widow, whom he had married about a year before he died, received her pension payments in accordance with such contract.

Neither the petitioner nor any of its subsidiaries or affiliates were ever under any contractual obligation to make any payments to Sheeran's widow upon her husband's death.

Neither Sheeran nor his widow were stockholders of the petitioner and Sheeran's widow at no time rendered any services to the petitioner or its predecessors.

For the years 1938 through 1943, inclusive, the respondent allowed the petitioner deductions totaling the sum of $52,917 paid to Sheeran's widow during those years pursuant to the resolution of the board of directors. Prior to 1951, the respondent did not tax Sheeran's widow on these payments. However, for 1951 and subsequent years the respondent determined that the payments were taxable to her; she has reported them as "service payments received" and has paid her income tax accordingly.

The salaries of the principal executive officers of petitioner were fixed by its board of directors.

In his notice of deficiency, the respondent disallowed the deductions claimed for the payments of $7,500 per annum made to Sheeran's widow for the years 1944 to 1949, inclusive, on the ground that such payments made after December 31, 1943, were not reasonable.

The annual payments made to Sheeran's widow during the years 1944 through 1948, inclusive, were paid by the petitioner in recognition of Sheeran's past services and were reasonable in amount.

## Issue 2.

After the petitioner acquired the bus franchises and commenced operation of the motorized lines, it negotiated an employment contract with the union representing its employees, the first such contract being executed on July 22, 1937. Subsequently, other agreements were similarly negotiated as the previous contracts expired. In August 1946, the union presented demands for a new contract and wage increases to become effective October 1, 1946, upon expiration of the then existing contract.

On October 7, 1946, an agreement between the union and petitioner was signed which provided that any subsequent labor contract resulting from the negotiations would be retroactive to October 1, 1946, the date of expiration of the old contract. As in the case of prior wage negotiations, petitioner's employees continued to work pending an agreement as to the new wage scale, and were paid at the rates provided in the expired contract. Negotiations over the terms of the new contract had not been concluded on December 31, 1946.

Sometime prior to March 1947, petitioner closed its books for the year 1946 and accrued the additional wages which its officers estimated to be due and owing to its employees for their services from

October 1 to December 31, 1946. The additional wages were estimated by petitioner's officers on the basis of their experience, the wages being paid in the industry, the increased cost of living, and other relevant facts as they existed October 1, 1946. The employees who maintained petitioner's books of account belonged to the union with which petitioner was then negotiating. Therefore, the accruals of these amounts were included among legal expenses payable lest petitioner be prejudiced in its negotiations with the union.

The amount accrued for additional wages due to the employees, $83,226.52, was computed at the rate of 6 cents per hour and was included in the deduction for wages in petitioner's tax return filed on March 15, 1947.

Petitioner and the union had failed to negotiate a satisfactory agreement covering all terms of the new labor contract by the end of February 1947; accordingly, on March 7 the parties agreed to submit the matter to arbitration. Resort to arbitration in the event direct negotiations proved unsuccessful was petitioner's customary practice. There had been six previous contract terminations prior to expiration on September 30, 1946, of the agreement then in effect; in three instances the negotiations with the union were concluded directly by the parties to the negotiations and in three other instances the terms of employment had to be determined by arbitration.

One of the issues submitted to arbitration in 1947 was the amount, if any, of a retroactive wage rate increase to be paid for the period October 1, 1946, through the end of the contract period to be fixed. The parties agreed when submitting the matter to arbitration that the decisions of the arbitrator would be binding on the parties. The proceeding before the arbitrator required 22 days of hearings. The petitioner's position throughout these hearings was that the union employees were not entitled to any retroactive wage increase and that an increase was not justifiable under any economic theory advanced by the union. On June 18, 1947, the arbitrator promulgated his award fixing the wage increase at an average of 6 cents per hour which was the amount already accrued by petitioner. In 1947 petitioner paid these additional wages covering services rendered by its employees from October 1 to December 31, 1946.

In the arbitration award of June 18, 1947, the following language appears:

### I.

*The demand of the Union that the Company grant an increase of $2.00 per day to all employees.*

#### Preliminary Statement

\*　　\*　　\*　　\*　　\*　　\*　　\*

At the outset, the arbitrator believes there is no simple formula or no set of rules which will uniquely and directly determine the wage dispute in this

case. The parties have introduced all the standard arguments for and against a wage increase—cost of living, ability to pay, prevailing rates and productivity. They have developed, with considerable imagination, other arguments peculiar to the distinctive facts of this case. The task of the arbitrator under these circumstances must be one of balancing conflicting theories, assigning weight to various arguments, and evaluating the significance of particular facts.

\* \* \* \* \* \* \*

The issue arises whether the arbitrator should be limited to events that happened prior to October 1, 1946 or whether consideration should be given to more recent developments. \* \* \*

\* \* \* \* \* \* \*

Unquestionably the rights of the parties must be determined as of September 30, 1946. But the parties both freely engaged in various predictions which recognized that certain trends then inherent bore on the determination of those rights. Therefore, facts that have occurred since September 30th should be considered in appraising those trends.

Following the preliminary statement are approximately 10 pages setting forth the petitioner's and the union's positions and the arbitrator's discussion in regard to the following factors bearing on the question of a wage increase, cost-of-living principle, transit and other industries (regarding the fact that the petitioner was already paying the prevailing rate), fringe benefits, and ability to pay. The award continues:

### E. ARBITRATOR'S DETERMINATION

As was indicated in the Preliminary Statement at the outset of the discussion of the demand for a general wage rate increase, the fundamental task of the arbitrator in this case is that of balancing and weighing conflicting equities in an "extension of the bargaining process." The preceding discussion has indicated the conclusions of the arbitrator with respect to each of the major considerations advanced by the parties.

The heart of the problem posed involves an appeal to commonly recognized standards which in this case yield conflicting results. The cost of living standard applied from the base of March 1, 1946 would yield a minimum increase of 15 or 16 cents per hour. The pattern of wage increases in the transit industry generally would indicate an increase of 10 to 13 cents per hour. These standards the Union naturally emphasizes.

The employees in this Company are receiving a rate equal to the highest paid to transit employees in New York City. The "prevailing rate" argument would yield no increase. The profits of the Company for 1946 declined from the levels generally attained in the past. Without a wage increase there are grounds for believing profits would be still lower in 1947. The Company is not in a position to seek an increase in the price of the services it sells. In view of the history of the five-cent fare in New York City and the fact that the City was not heard in these proceedings, the arbitrator has no comment to make on the possibility of any fare increase.

In the final reckoning of these equities, the decision of the arbitrator on Issue II, the pension plan, must be included. For reasons set forth in that section of this award, the decision has been made to grant the Union's request for a pension plan. The arbitrator has naturally considered the total burden of costs on the Company.

In the light of all these considerations, and weighing the equities of both parties, the arbitrator has decided upon a general wage rate increase of 6 (six) cents per hour.

On December 19, 1947, the union again served demands for increased wages and other benefits to take effect January 31, 1948, upon expiration of the period covered by the previous arbitration award.

On January 26, 1948, petitioner and the union concluded an agreement, similar to the contract of October 7, 1946, providing that any labor contract subsequently concluded between the parties would be retroactive to February 1, 1948. As in the previous negotiations, petitioner continued to pay the wage rates fixed by the terms of the previous contract pending agreement as to the amount of the increase. During these negotiations the petitioner consented to pay a wage increase effective May 1, 1948, conditioned upon the city's granting a fare increase, which the city did, and the petitioner paid that wage increase in 1948.

The union continued to press its demands for additional compensation for the period February 1 to April 30, 1948. As of December 31, 1948, the union and the petitioner had been unable to agree on the question of a wage rate increase for the period February 1 to April 30, 1948, and an arbitrator was appointed on March 1, 1949, to decide the matter. The petitioner maintained before the arbitrator that there was no justification for granting any wage rate increase retroactively to cover the period February 1 to April 30, 1948.

The petitioner sustained a large operating loss in the year 1948. At the end of the year the petitioner did not accrue on its books of account any amount as an estimate of a wage increase which its employees might eventually receive for their services from February 1 to April 30, 1948; however, the petitioner's officers did estimate such an amount to be 10 cents an hour prior to the filing of the petitioner's 1948 income tax return on May 13, 1949. The amount of the liability thus claimed on the 1948 return as an accruable deduction attributable to 1948 operations was $112,600 based on an estimated increase in the wage rate of 10 cents per hour.

On May 30, 1949, the arbitrator awarded an increase of 10 cents per hour, the amount previously determined and reported in petitioner's income tax return. Petitioner paid these additional wages for 1948 services in 1949.

The arbitrator's award of May 30, 1949, was not so extensive nor voluminous as that of June 18, 1947, but regarding the question of the wage increase, the arbitrator considered and weighed the same or similiar factors as did the prior arbitrator and in reaching his conclusion stated:

The Arbitrator has not attempted to note all the arguments made by the respective parties for or against an increase in wages for the three-month period in question. He has, however, considered all their views and thoroughly studied their separate contentions. No one single factor is responsible for the Arbitrator's determination. The conclusion on this issue as hereinafter noted

is based on many factors which are inextricably related. An arbitration relating to wages and many other issues is not conducted in a vacuum. The decision cannot be reached by the application of a precise mathematical formula and there is obviously no slide-rule method upon which such a determination can be based.

It is the Arbitrator's considered judgment that an award of 10¢ an hour increase to all employees for the period in question is fair and equitable.

The following is a schedule of hourly wages paid to operators by the company for the periods indicated:

SCHEDULE OF WAGES PAID TO OPERATORS[2]

| Wage rate | From | To |
|---|---|---|
| $0.69 | ---------- | Jan. 2, 1937 |
| 0.74 | Jan. 3, 1937 | July 21, 1937 |
| 0.82 | July 22, 1937 | Dec. 31, 1938 |
| 0.90 | Jan. 1, 1939 | Feb. 28, 1941 |
| 0.94 | Mar. 1, 1941 | Apr. 30, 1942 |
| 1.00 | May 1, 1942 | Apr. 30, 1945 |
| 1.04 | May 1, 1945 | Feb. 28, 1946 |
| 1.20 | Mar. 1, 1946 | Sept. 30, 1946 |
| 1.26 | Oct. 1, 1946 | Jan. 31, 1948 |
| 1.36 | Feb. 1, 1948 | Apr. 30, 1948 |
| 1.50 | May 1, 1948 | June 30, 1949 |
| 1.55 | July 1, 1949 | Dec. 31, 1950 |

[2] Wages used are top rates paid to bus operators; other employees' wages were increased proportionately.

The respective liabilities for the retroactive wages were contested and thus contingent in each of the years 1946 and 1948, and were not deductible in those years.

*Issue 3.*

On November 30, 1948, this Court rendered its Memorandum Opinion in *New York City Omnibus Corporation, supra.* The decision was formally entered on December 22, 1948. The petitioner here was the taxpayer involved in that case. The decision found deficiencies in petitioner's taxes for the years 1937 to 1939, inclusive. The principal issue in that case was the cost of the petitioner's bus franchise for amortization purposes, a question of fact; after hearing voluminous conflicting evidence, this Court held that the record failed to establish that the proper basis was more or less than the amount determined in the deficiency notice. The opinion determined the tax basis of petitioner's franchise, the normal useful life of its motor coaches, and the annual depreciation deductions properly allowable in respect of the franchise and coaches. These determinations also affected the petitioner's income and excess profits tax liability for the years 1940 through 1947.

Prior to December 31, 1948, Stephen Duggan, the petitioner's comptroller-vice president and the officer in charge of the petitioner's

tax matters, advised McCarthy, petitioner's president, that the petitioner should not appeal from this Court's decision of December 22, 1948. Duggan had previously conferred with petitioner's tax counsel on the advisability of this appeal. McCarthy agreed with Duggan that the decision should not be appealed.

The minutes of the meeting of the petitioner's board of directors, held on February 25, 1949, refer to a statement by Boykin C. Wright to the effect that after consulting with petitioner's officers in regard to the advisability of appealing this Court's decision he had suggested that the petitioner not appeal, unless the respondent appealed in which case he believed that the petitioner should file a cross-appeal. This meeting was the first meeting of the board since December 9, 1948. It is not known whether Wright conferred with the officers before or after December 31, 1948. The minutes do not disclose any further discussion of the matter at the meeting. Wright was a member of the petitioner's board of directors and the senior partner of the law firm which represented the petitioner in tax matters, but he did not represent the petitioner in the prior tax case. The respondent did not decide whether or not to appeal the Court's decision prior to January 1, 1949.

On December 29, 1948, the petitioner filed amended Federal income and excess profits tax returns for the years 1940 through 1942 revising its deductions and reporting the adjustments made necessary in order to conform to this Court's decision. In a letter dated December 30, 1948, petitioner's counsel transmitted four checks to the collector of internal revenue for the third district, New York, New York. The letter stated in part as follows:

Reference is made to my letter of December 29, 1948, transmitting amended returns of the above named Company for the years 1940, 1941 and 1942. It is my understanding that the deficiencies in taxes and interest, as disclosed by the amended returns, will be assessed on or before December 31st.

A copy of the decision of the Tax Court determining deficiencies for 1937 to 1939, inclusive, was enclosed with my letter of December 29th. As previously stated, the Company desires at this time to pay its deficiencies, with interest, for all years 1937 to 1942, inclusive. Accordingly, I enclose one check in payment of the deficiencies and interest for 1937 to 1939, inclusive, and separate checks to cover the deficiencies of taxes and interest for each of the years 1940, 1941 and 1942. These checks have been certified.

The deficiencies and interest covered by the respective checks are as follows:

| Year | Deficiencies | Interest | Total |
|---|---|---|---|
| 1937 | $95, 613. 90 | $61, 906. 18 | $157, 520. 08 |
| 1938 | 106, 393. 84 | 62, 502. 13 | 168, 895. 97 |
| 1939 | 106, 864. 74 | 56, 366. 88 | 163, 231. 62 |
| Total | | | $489, 647. 67 |
| 1940 | 154, 943. 01 | 72, 429. 66 | 227, 372. 67 |
| 1941 | 202, 537. 89 | 82, 526. 09 | 285, 063. 98 |
| 1942 | 262, 450. 51 | 91, 193. 14 | 353, 643. 65 |

The checks mailed to the respondent in December in payment of these deficiencies and interest for the years 1937 through 1942 totaled $1,355,727.97.

Petitioner's counsel was advised on December 30, 1948, by the then collector of internal revenue for the third district of New York that the deficiencies referred to in the letter would be assessed on December 31, 1948, and that the above-mentioned checks would be applied in payment of said deficiencies. However, the collector did not assess the above-mentioned deficiencies for the years 1937, 1938, and 1939 until April 1, 1949, and the amounts of $95,613.90, $106,393.84, and $106,864.74 referred to above were held in the collector's suspense account until April 1, 1949, when they were applied against the assessments made on that date. The deficiencies referred to in petitioner's letter for the years 1940, 1941, and 1942 were assessed on December 31, 1948, and paid on that same date.

The petitioner did not pay in 1948 its tax deficiencies for the year 1943 and subsequent years resulting indirectly from this Court's decision. However, prior to December 31, 1948, it did compute and accrue the amounts of the deficiencies and interest resulting from adjusting, in accordance with this Court's opinion, the taxable income originally reported before giving effect to a net operating loss deduction from 1948 and the carrybacks of unused excess profits credits. The amount of the interest thus accrued on the petitioner's books on additional taxes from 1943 to 1947 amounted to $109,802.30. The petitioner deducted this amount in its income tax return for the year 1948 which was filed on March 15, 1949.

Neither the petitioner nor the respondent appealed from this Court's decision of 1948. The decision of this Court, entered December 22, 1948, did not become final and was appealable until 3 months later. Sec. 1140.

The respondent disallowed the claimed deduction for interest in the amount of $109,802.30 for the year 1948 on the ground that the liability therefor was not finally determined before the end of that year.

Petitioner had acquiesced in this Court's decision, and the liability for the interest was not being contested and was finally determined as of the end of 1948.

OPINION.

*Issue 1.*

The respondent contends that the payments in question are not deductible as additional compensation because the salary paid to Sheeran during his life was reasonable in amount, and that anything in excess of the amounts paid to him would be unreasonable. In the alternative, he contends that the payments are gifts.

The petitioner contends that the payments are further compensation for Sheeran's past services and that, alternatively, even if the payments are gifts, they are nonetheless ordinary and necessary business expenses.

It must be presumed that the petitioner's board of directors in authorizing Sheeran's salary increase and the payments to Sheeran's widow was acting validly and reasonably; neither Sheeran nor his widow were stockholders of petitioner, and the rule of close scrutiny of transactions involving stockholder-officers is not applicable here. *Ox Fibre Brush Co.* v. *Blair*, 32 F. 2d 42, 45 (C.A. 4, 1929), affirmed sub nom. *Lucas* v. *Ox Fibre Brush Co.*, 281 U.S. 115 (1930); cf. *Heil Beauty Supplies* v. *Commissioner*, 199 F. 2d 193 (C.A. 8, 1952). However, the petitioner must nonetheless prove that the payments in question are clearly within the scope of section 23(a), which provides, as a matter of legislative grace, for the deduction of ordinary and necessary business expenses.[3] *New Colonial Co.* v. *Helvering*, 292 U.S. 435 (1934).

The respondent relies, in part, on cases where the issue was the taxability of the payments to the recipient. Following the test set forth in *Bogardus* v. *Commissioner*, 302 U.S. 34 (1937), namely, that the donor's intention governs the question, we have on several occasions found such payments to be gifts, relying on some, if not all, of the following facts as indicative of donative rather than compensatory intent: The fact that the payments were made directly to the deceased employee's dependent and not to the deceased's estate; the fact that the employee had been fully compensated for his services; the fact that the donor had no contractual obligation to make the payments to the dependent; the fact that the dependent had performed no services for the donor. *Florence S. Luntz*, 29 T.C. 647 (1958); *Estate of John A. Maycann, Sr.*, 29 T.C. 81 (1957); *Estate of Arthur W. Hellstrom*, 24 T.C. 916 (1955). As pointed out above, these factors were considered in relation to the tax treatment of the payments in the hands of the recipient. Here, we do not consider the

---

[3] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) EXPENSES.—

(1) TRADE OR BUSINESS EXPENSES.—

(A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered * * *

Regulations 111, sec. 29.23(a)–9. PENSIONS—COMPENSATION FOR INJURIES.—Amounts paid by a taxpayer for pensions to retired employees or to their families or others dependent upon them, or on account of injuries received by employees, and lump-sum amounts paid or accrued as compensation for injuries, are proper deductions as ordinary and necessary expenses. Such deductions are limited to the amount not compensated for by insurance or otherwise. When the amount of the salary of an officer or employee is paid for a limited period after his death to his widow or heirs, in recognition of the services rendered by the individual, such payments may be deducted. * * *

tax treatment of such payments in the hands of the recipient to be conclusive of the precise issue before us, namely, whether the payments are ordinary and necessary business expenses. The making of such payments may have an ordinary and necessary relationship to the conduct of the payor's business. An analysis of the petitioner's board of directors' intentions in authorizing these payments is appropriate to the determination of whether the payments are ordinary and necessary business expenses. Thus, the above cases relied on by respondent are relevant as guides to the determination of the board's intentions, a question of fact, but are not controlling on the legal issue before us.

The motives for making the payments here involved are ambiguous and multiple; such is often the case. In *Peters* v. *Smith*, 221 F. 2d 721, 725 (C.A. 3, 1955), it was noted that "the employer in providing the questioned payments did not indicate unequivocally whether such action was intended as additional compensation for past services, or merely as an expression of a philanthropic attitude, or as a bid for employee good will, or as some combination of these." In the instant case, we find that the payments to Sheeran's widow were intended in part as additional compensation for past services rendered by Sheeran, in part to show gratitude for such past services, and in part to aid in the support of Sheeran's widow.

Sheeran's salary was increased in November 1937 from $28,500, the figure at which it had been fixed for many years, to $35,000 only after Sheeran's most difficult tasks and heaviest responsibilities concerning efforts to achieve successful motorization of the petitioner's operation had terminated. The record does not disclose any increase in his duties after 1937 which would have motivated the salary increase; to the contrary, his duties after 1937 were lighter than those he performed during the difficult years leading up to successful motorization.

The petitioner, in contending that one reason Sheeran's salary was increased was to further compensate him for services rendered prior to 1937, argues that the salary increase was not granted earlier because of the large losses suffered by petitioner during those years. Concededly, there is some logic to respondent's argument, on brief, that:

it must be realized that this was a company whose net losses from 1927 through 1935 amounted to approximately a million dollars yearly. Whereas any salary increases granted to Sheeran would, at the most, have only amounted to a few thousand dollars a year, it seems extremely unlikely that such small amounts in comparison with the large yearly losses would have any effect whatsoever on the overall economy of the Company.

But the respondent's argument, if accepted, does not preclude the possibility that the petitioner's board of directors, in not granting Sheeran a salary increase earlier, were in fact influenced by such large losses. In any event, the respondent utterly fails to suggest what else

could have motivated the increase in Sheeran's salary in rebuttal of the petitioner's argument that the increase was granted largely in recognition of Sheeran's past services.

The respondent relies on the amount of salary paid to Ritchie and McCarthy, Sheeran's immediate successors, as evidence that Sheeran was paid a fair and reasonable amount for his services during his life. However, Ritchie was receiving large sums from related companies and was petitioner's president for only a short period of time. McCarthy did not have Sheeran's record of long service. Both of them served as president during times in which they were not faced with the same magnitude of problems and responsibilities that Sheeran bore prior to successful motorization. The amount of salary paid to Ritchie and McCarthy does not prove that Sheeran was paid a fair and reasonable amount for his services during his life.

While four executives of other transit companies received annual salaries prior to 1937 ranging from $36,000 to $60,000, except for showing what offices these executives held, and that the Third Avenue Railway System was comparable in size to the petitioner, the petitioner has not shown that these executives were in positions comparable in responsibility to Sheeran's. But evidence of the salaries of executives in comparable positions, while desirable, is not the only method of proving the reasonable value of services rendered. *Faucette Co.*, 17 T.C. 187 (1951).

Relying on *Estate of John A. Maycann, Sr., Florence S. Luntz*, and *Estate of Arthur W. Hellstrom*, all *supra*, the respondent contends that because there was no contractual obligation on the part of petitioner to make the payments to Sheeran's widow and because of other factual similarities to those cases the payments here are gifts and cannot be in the nature of additional compensation. However, in those cases it was not found that the deceased employee had not been fully compensated for his services. Further, the determinative factor is one of intent and a contractual obligation is not essential to proving compensatory intent; the existence of a moral obligation could be enough. See *Bogardus* v. *Commissioner, supra.* Here we find the existence of such moral obligation in the fact that Sheeran's increase in salary to compensate him fairly for past services was granted only 4 months prior to his death.

The respondent relies on *McLaughlin Gormley King Co.*, 11 T.C. 569 (1948), but that case is clearly distinguishable, for we found that the petitioner's directors were more concerned with the plight of the widow than they were with any belated recognition of adequate compensation to the deceased. We sustained the respondent's disallowance of the deductions of those payments made to the widow after November 1941 where the deceased had died in 1939. A material part

of that holding was the finding that a trust established by deceased, the deceased's widow, and close relatives together held 89 per cent of the petitioner's stock. Obviously, such circumstances suggest the possibility of a hidden distribution of profit, a factor completely absent here.

The only reasonable inference from the evidence is that Sheeran was granted his salary increase substantially because of his services to the petitioner prior to 1937. There is nothing in the record to suggest that Sheeran's salary of $35,000 would not have continued had he lived more than 4 months after he was given his salary increase. The totality of the payments made to Sheeran's widow through 1948 is equivalent to Sheeran's salary for 31 months. Some substantial part of the payments to Sheeran's widow was in the nature of reasonable additional compensation for Sheeran's past services.

Undoubtedly, the petitioner's directors in authorizing the payments to Sheeran's widow were motivated in part by a sense of gratitude for Sheeran's past services and the need for aiding the support of Sheeran's widow. To the extent they were so motivated, the payments here in question may have been, as the respondent contends, gratuitous. However, to be deductible, the payments need not be in the nature of additional compensation. *I. Putnam, Inc.*, 15 T.C. 86 (1950). It is only necessary, according to the respondent's own ruling, that the payments be reasonable and be paid only for a "limited period." I.T. 3329, 1939–2 C.B. 153. The respondent has ruled that the limited period rule refers to the reasonableness of the amounts rather than to the time over which they are paid. Rev. Rul. 54–625, 1954 C.B. 85, 87.

In *I. Putnam, Inc.*, *supra*, the respondent had disallowed payments in excess of an amount equal to 18 months of the deceased's salary. We found that payments of the deceased's salary for 24 months rather than 18 months was a limited period. It is to be noted that while payments of the deceased's salary had continued for 40½ months, unlike the instant case not only was the deceased one of two principal stockholders, but further no part of the payments represented additional compensation. Here the payments to Sheeran's widow were equal to 2 years and 7 months of Sheeran's salary. They were reasonable in amount and were paid within a limited period.

Bearing on the question of the deductibility of these payments as an ordinary and necessary business expense is the fact that the petitioner's directors were aware of the possible favorable effect created upon the morale and incentive of the petitioner's other executives, and the benefit accruing therefrom to the petitioner.

We hold that the payments to Sheeran's widow from 1944 through the year 1948 were ordinary and necessary business expenses to the petitioner.

*Issue 2.*

The petitioner contends that under the circumstances it was liable in 1946 and 1948 to pay just compensation for services rendered in those years and that since it could accurately estimate the wage increases necessary for just compensation, the amounts in question were properly deductible in the years here involved.

The respondent contends that the petitioner not only failed to admit but actually contested wage liability during the years in question, and thus that liability was not reasonably established in those years.

We agree with the respondent.

Generally, for an item to be accruable and thus deductible in a given year, the events fixing the amount and the fact of liability must occur in that year, and "this cannot be the case where the liability is contingent and is contested by the taxpayer." *Dixie Pine Products Co.* v. *Commissioner*, 320 U.S. 516 (1944). The petitioner contends that its position during the arbitration proceedings that no wage increases were justified under any economic theory was a mere stratagem to hold down the wage increases to be granted by the arbitrator to the amounts which it had accurately estimated prior to arbitration. In effect, the petitioner is arguing that one of the factors it took into consideration in making its estimate of wage increases was the fact that it would claim no wage increases were justified. Therefore, the petitioner contends its position in the arbitration proceedings was not really one of sincerely contesting the estimated liabilities. However, it must be appreciated that, realistically, where a party to any legal proceeding, realizing that in all probability its case will not be entirely successful, denies any liability, it does so for much the same reasons that the petitioner here contends motivated it to deny liability in the arbitration proceedings. Although a party in such a case might realize its chances of success are slight, it has nonetheless contested the alleged liability. Taxation is a practical matter; the rule that has become the law and proved workable is that truly contested liabilities are not accruable and deductible. The petitioner would have us develop an exception that would be quite impractical of application, and one that would create a departure from the usual concept of what constitutes contesting a liability. See *Gunderson Bros. Engineering Corp.*, 16 T.C. 118 (1951).

Further, there is no evidence in the record which would amount to admissions of liability in 1946 and 1948. Certainly the hidden accruals for such amounts for the year 1946 among legal expenses and the deductions on the petitioner's returns for 1946 and 1948 do not amount to such admissions.

It is not evident from the language of the arbitration awards that all of the events necessary to establish liability, as established by the

arbitrators, occurred within the years 1946 and 1948. Particularly, in the award of June 18, 1947, it is stated, "Therefore, facts that have occurred since September 30th should be considered in appraising those trends." Since the arbitrator was not thinking in terms of a calendar year, he could have been referring to facts which might have existed after December 31, 1946. The petitioner has not shown that the arbitration award of 1949 was not determined in like manner.

The agreements that petitioner entered into with the union during the years 1946 and 1948 provided only that any labor contract to be subsequently negotiated would be retroactive to those years. There is neither admission of nor creation of liability for any wage increases in such agreements. The petitioner did agree to be bound by the arbitrators' awards, but those agreements were entered into respectively after the close of each year here involved. It is true that the petitioner was able to estimate accurately its future liabilities, and it was probable in light of the petitioner's past history that wage increases would be granted, but no liability in fact existed in 1946 and 1948. In fact, the petitioner was liable in 1946 and 1948 only for the wages it had agreed to pay in those years. Subsequently, the arbitrators granted wage increases, but it was not inevitable that they would do so. To this extent the situation here is analogous to that in *Jamaica Water Supply Co.*, 42 B.T.A. 359 (1940), affd. 125 F. 2d 512, 513 (C.A. 2, 1942), wherein the Court of Appeals stated:

So the dispute between the City and the petitioner, while it did relate solely to the rate, was not one which when finally determined would inevitably result in some amount being due from the City to the petitioner. It would only have that result in the event that the payments made by the City should turn out to be less than what was just and reasonable. * * *

That case was concerned with the accrual of income, but the principle is nonetheless applicable. See *Atlantic Coast Line Railroad Co.*, 4 T.C. 140 (1944). Certainly the respondent would not have been successful in claiming that these wage increases were properly deductible only in 1946 and 1948; the petitioner could have shown that it was actively contesting any wage increases in arbitration. *Dixie Pine Products Co.* v. *Commissioner, supra.*

The petitioner relies on *Schuessler* v. *Commissioner*, 230 F. 2d 722 (C.A. 5, 1956), reversing 24 T.C. 247 (1955); *Pacific Grape Products Co.* v. *Commissioner*, 219 F. 2d 862 (C.A. 9, 1955), reversing 17 T.C. 1097 (1952); *Harrold* v. *Commissioner*, 192 F. 2d 1002 (C.A. 4, 1951), reversing 16 T.C. 134 (1951); *Central Cuba Sugar Co.* v. *Commissioner*, 198 F. 2d 214 (C.A. 2, 1952), reversing and affirming in part 16 T.C. 882 (1951). However, we think those cases are clearly distinguishable. In *Kenyon Instrument Co.*, 16 T.C. 732 (1951), the petitioner was not contesting liability but had issued credit memoranda in 1943 and made payments in refund to the prime contractors

in 1943 and 1944. It was held that the respondent had properly determined that the amounts paid were deductible in 1943. Factually, that case is clearly distinguishable.

We have carefully considered the other cases relied on by the petitioner and find that they do not adequately support its contentions. In particular, *Fraser Brick Co.*, 10 B.T.A. 1252 (1928), and *Raleigh Smokeless Fuel Co.*, 6 B.T.A. 381 (1927), are clearly distinguishable. In each of those cases we allowed a deduction for a liability arising from a breach of contract in the year of the breach because liability was admitted and negotiations for settlement of the exact amount were begun in that year. In *Lucas* v. *American Code Co.*, 280 U.S. 445 (1930), the Supreme Court distinguished these cases for the same reasons, and also noted that this Court (Board of Tax Appeals) had held in a number of cases, "that a loss * * * is not deductible * * * except * * * where, within the tax year, there is a definite admission of liability, negotiations for settlement are begun and a reasonable estimate of the amount of the loss is accrued on the books."

The Supreme Court, in the same case, further observed that "[t]he general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal test." While that case involved losses from a breach of an employment contract, the question was basically the same, that of the proper year of accrual. In this connection, it is to be noted that the instant situation is not one where the petitioner has shown that in prior years it followed a consistent method of accruing such retroactive wage increases in the years in which the services were rendered.

While factually distinguishable, the principles set forth in *Atlantic Coast Line Railroad Co.*, *supra*, govern the disposition of the issue before us. See *Security Flour Mills Co.* v. *Commissioner*, 321 U.S. 281 (1944).

We hold that the respondent correctly determined that the wage increases determined by arbitration in 1947 and 1949 were not deductible expenses in 1946 and 1948.

## *Issue 3.*

The respondent contends that because the petitioner had contested, indirectly, the liability for interest here involved in this Court, and, as of the end of 1948, had not clearly acquiesced in this Court's appealable decisions, nor admitted and communicated admission to the respondent of the liabilities determined by this Court, the liability was still contested and, thus, contingent as of the end of that year. *Dixie Pine Products Co.* v. *Commissioner, supra; Hidalgo Steel Co., Inc.*, 8 B.T.A. 76 (1927) ; *Hamler Coal Company*, 4 B.T.A. 947 (1926).

The petitioner contends that the facts show that it did acquiesce in the decision rendered in 1948, and was not, as of the end of that year,

contesting the liabilities determined, directly and indirectly, by that decision. See *Lynch* v. *United States*, an unreported case (D. Ore., 1952; 44 A.F.T.R. 1343, 53–1 U.S.T.C. par. 9125).

We agree with the petitioner.

The item in controversy, in the amount of $109,802.30, is interest on deficiencies for the years 1943–1947, inclusive, determined indirectly by this Court's decision rendered in December 1948. The parties are agreed as to the amount. It is properly accruable in the year in which the liability for the deficiencies became fixed and definite. See *H. E. Harman Coal Corporation*, 16 T.C. 787 (1951) ; *Lehigh Valley Railroad Co.*, 12 T.C. 977 (1949) ; *Brooklyn Union Gas Co.*, 22 B.T.A. 507 (1931), affd. 62 F. 2d 505 (C.A. 2, 1933) ; sec. 23(b) ; [4] Regs. 111, sec. 29.43–2.[5]

In *Dixie Pine Products Co.* v. *Commissioner*, *supra*, the Supreme Court stated at page 519 that:

all the events must occur in that year which fix the amount and the fact of the taxpayer's liability for items of indebtedness deducted though not paid; and this cannot be the case where the liability is contingent and is contested by the taxpayer * * * [the taxpayer] must * * * await the event of the state court litigation and might claim a deduction only for the taxable year in which its liability for the tax was finally adjudicated.

In that case, the liability for the State taxes was being actively litigated in the year for which the deduction was claimed. The Supreme Court did not specifically state what constituted the final adjudication it determined necessary for accrual and, thus, did not answer the question before us.

The act of taking an appeal from a lower court decree or judgment determining an otherwise deductible liability against a taxpayer constitutes a contesting of the liability and postpones accrual and deduction of the item, unless paid, until the litigation is finally terminated. *Security Flour Mills Co.* v. *Commissioner*, *supra; Dixie Pine Products Co.* v. *Commissioner*, *supra; Lucas* v. *American Code Co.*, *supra; Boston Elevated Railway Co.*, 16 T.C. 1084 (1951), affd. 196 F. 2d 923 (C.A. 1, 1952) ; *Virginia Stage Lines, Inc.*, 16 T.C. 557 (1951) ; *North American Coal Corporation*, 28 B.T.A. 807 (1933). Further, the actual denial of liability against those who assert it, whether in court or otherwise, makes the liability contingent and contested. *Gunderson Bros. Engineering Corp.*, *supra; Great Island*

[4] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions :

(b) INTEREST.—All interest paid or accrued within the taxable year on indebtedness * * *

[5] Regulations 111, sec. 29.43–2. WHEN CHARGES DEDUCTIBLE.—Judgments or other binding adjudications, such as decisions of referees and boards of review under workmen's compensation laws, on account of damages * * * or other cause, are deductible from gross income when the claim is so adjudicated or paid, unless taken under other methods of accounting which clearly reflect the correct deduction * * *

*Holding Corporation*, 5 T.C. 150 (1945). The same principles have been found generally applicable to the question of the accrual of income. *Jamaica Water Supply Co.*, *supra*. None of these cases clearly indicate that the mere existence of the right of appeal here would make the liability determined by this Court so contingent as to preclude accrual in 1948.

The Tax Court decision of December 1948 was an adjudication of the liabilities there involved. It was a final decision in the sense that it was permanent rather than temporary, and, thus, one from which an appeal could be prosecuted. Sec. 1117(c), sec. 1140, sec. 1142. This Court's opinion in 1948 found certain facts which resulted indirectly in the deficiencies upon which the interest here involved accumulated. Unless that decision was appealed and reversed upon appeal, it precluded any further contesting by either party of the factual issues there determined, by the rule of collateral estoppel. *Commissioner* v. *Sunnen*, 333 U.S. 591 (1948). Thus, the decision established certain facts necessary for the determination of the liability here involved. Further, it was an apparent termination of the litigation between the parties concerning those factual questions. Whether the liability here involved was thereafter so contingent as to preclude its accrual in 1948 depends on the reasonableness of expecting that the decision would be appealed. See *Kenyon Instrument Co.*, 16 T.C. 732, 738, 739 (1951).

The weight of the evidence indicates that the petitioner, as of the end of the year 1948, did not contemplate appealing this Court's decision. We need not repeat all the evidence here; it is sufficient to note Duggan's advice to McCarthy, the latter's agreement with that advice, the accruing of the liability on the books prior to the close of the year, the filing of amended returns for the years 1940 to 1942, inclusive, and the letter and payments made, even though the petitioner might have had other motives in making these payments. See sec. 292(a), as amended by the Revenue Act of 1944, sec. 14 (c) and (e).

The only evidence suggesting that the petitioner contemplated appealing this Court's decision was the statement by Wright at the petitioner's board of directors meeting early in 1949. Considering all the circumstances surrounding that statement, we deem it of little weight.

It is true that the respondent did not decide not to appeal until sometime in 1949, but his grounds for appeal, insofar as they would have related to the basis question, certainly would not have challenged the findings that the petitioner was entitled to a smaller basis than it had claimed. Further, the respondent evidently took cognizance of the basis figures established by this Court in assessing the deficiencies for the years 1940 through 1942, inclusive, as requested by

petitioner, and insofar as the record discloses, in accordance with the amended returns for those years filed by the petitioner in 1948.

In *H. Liebes & Co.* v. *Commissioner*, 90 F. 2d 932 (1937), affirming 34 B.T.A. 677 (1936), the question was whether the right to appeal precluded the accrual of income resulting from a judgment in the year the judgment was rendered. The taxpayer had sued the United States in a California District Court upon which jurisdiction had been conferred by Federal statute to determine claims against the United States for damages or loss caused by interference by the United States with sealing operations in the Bering Sea. Judgment was rendered for the taxpayer in its fiscal year ended January 31, 1929, but the time for filing an appeal did not expire until 3 months later in the taxpayer's fiscal year ended January 31, 1930. We (Board of Tax Appeals) held that the right established by the judgment was too contingent for the accrual of income in the year judgment was rendered because it was stipulated only that the United States had not appealed the judgment, and not that a final settlement or agreement not to appeal was reached within the petitioner's fiscal year 1929; further, no appropriation was available to satisfy the judgment in the year rendered. In affirming our decision the Court of Appeals did not rely on the absence of an appropriation but reasoned that:

If appeal is taken, the right is not fixed until determination of the appeal; and if no appeal is taken, the right is fixed. We believe in the latter situation that the right becomes fixed on termination of the appeal time. * * * [90 F. 2d at 938.]

The Court thus concluded that the right to receive the income was not fixed or unconditional. It noted that its holding would coincide with the Government's practice of usually not paying judgments until the time for appeal had expired. The rule applied in that case, however, is not conclusive of the issue before us, for the question of when an item is properly accruable not only requires a practical test, but is "largely a question of fact, to be determined in each case." *San Francisco Stevedoring Co.*, 8 T.C. 222, 226 (1947) ; see *Lucas* v. *American Code Co.*, *supra*. The petitioner's liability in the instant case established by this Court's decision was substantially fixed and unconditional in the year 1948 because it was extremely unlikely that the decision would be appealed. Unlike the situation in *H. Liebes & Co.* v. *Commissioner*, *supra*, where the decision which might have been appealed from involved the application of a statute recently enacted, this Court's decision in 1948 was based on findings of fact established by voluminous conflicting evidence. Further, there was no evidence in *H. Liebes & Co.* v. *Commissioner* that the United States did not intend in the fiscal year 1929 to appeal the judgment of the Califor-

nia District Court; the petitioner here did not intend in 1948 to appeal this Court's decision.

Insofar as our research discloses, with the single exception of *Lynch v. United States, supra,* this is the first case in which the respondent has contended that the mere right to take an appeal makes the liability for a tax determined by this Court contested and thus contingent within the meaning of *Dixie Pine Products Co.* v. *Commissioner, supra.* In *Lynch* v. *United States, supra,* the District Court found as a fact that:

immediately after the decision of the Tax Court on December 19, 1946, plaintiff stated that he would not appeal said decision and acquiesced in the decision, and paid on December 27, 1946, the 1941 deficiency assessment in full, and on December 30, 1946, attempted to pay the full deficiency assessment and interest for the other years. * * *

The Court allowed the accrual of the deficiencies and deduction of the interest for all the years there involved in 1946. The respondent contends that that case, while similar, is distinguishable because evidently the proper amounts for all years were actually paid in 1946, once effect was given to credits for certain overpayments, and, further that here there had been no such acquiescence in the decision as of the end of the year 1948. However, we have found that the petitioner here did acquiesce in this Court's decision prior to January 1, 1949. Therefore, the *Lynch* case could be considered distinguishable if at all only because of the payments there made in the year 1946. See *Consolidated Edison Co. of New York* v. *United States,* 135 F. Supp. 881 (Ct. Cl., 1955); *Chestnut Securities Co.* v. *United States,* 62 F. Supp. 574 (Ct. Cl., 1945); *Lehigh Valley Railroad Co., supra; Brooklyn Union Gas Co., supra.* In the instant case, the petitioner did not pay the interest here involved until after the end of the year 1948.

We have carefully considered other decisions of this Court in which the factual situations involved determinations of rights or liabilities of taxpayers by various boards from some of which an appeal or other procedural steps could be taken or the determination could be otherwise challenged. In certain of these cases this Court, after weighing the facts, decided that the probability of the determination being set aside was so slight that the right or liability was substantially fixed or unconditional, and accrual of the item was allowed in the year the determination was made. *Columbus & Southern Ohio Electric Co.,* 26 T.C. 722 (1956), affd. 244 F. 2d 79 (C.A. 6, 1957), certiorari denied 355 U.S. 822 (1957); *Kenyon Instrument Co., supra; Lehigh Valley Railroad Co., supra* (the accrual of income issue). A judgment of this Court based on a finding of fact should not be accorded less dignity.

The respondent contends that there was no clear admission of liability by reason of the payments or the letter in 1948. We agree, but that does not preclude the petitioner's case here. We have found that the litigation terminated on December 22, 1948, and we have looked to the probability of the right of appeal being exercised to determine if the liability was nonetheless too contingent to allow accrual. Actual admission of liability is essential where a liability is being contested as one method of terminating the contest, but not as here where the dispute has already been resolved. The only question here was whether conditions were such after that decision that the liability was, in substance, still being contested; we have found that it was not. See *Columbus & Southern Ohio Electric Co.*, *supra; Kenyon Instrument Co.*, *supra.*

This Court's decision in 1948 established the facts necessary for determining the liability here involved. The petitioner accrued that liability upon its books in 1948. The record does not disclose that the deficiencies and interest for the taxable years 1943 through 1948, inclusive, or any part of them, were assessed prior to the end of the year 1948. But assessment is not necessary for proper accrual because "it is also true that in advance of the assessment of a tax, all the events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it." *United States* v. *Anderson,* 269 U.S. 422 (1926).

We hold that the liability for the interest was sufficiently determined in 1948 for its proper accrual and deduction in that year.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

HARRON, *J.*, dissenting: I do not agree with the holding made under the third issue and, therefore, respectfully dissent.

In my opinion the evidence does not support or warrant a finding and conclusion that all of the events had occurred in 1948 which fixed petitioner's liability for tax deficiencies and interest thereon for the taxable years 1943–1947, inclusive, and had removed all elements of contingency with respect to such liability. Petitioner's burden of proof necessarily must be directed to the facts as they existed on or before December 31, 1948, and our consideration of whether petitioner's evidence successfully discharges its burden of proof should distinguish as accurately as possible between what became certain after the end of 1948 and what was fixed and determined on December 31, 1948. The light to be cast upon the situation cannot be derived from hindsight. The fact that eventually neither party appealed from this Court's decision of issues pertaining to petitioner's income tax liability for the years 1937–1939 should not influence our consideration of petitioner's

proof under this issue. We are required to studiously avoid, in weighing the evidence, allowing the balance to be ever so slightly tilted toward petitioner's favor by that fact.

It is not enough for petitioner to say, now, that on December 31, 1948, no contingency any longer existed with respect to its liability for tax deficiencies for the years 1943–1947, or for the years 1937 through 1942, and for interest thereon, merely because its president, McCarthy, purportedly agreed with Duggan, its vice president and comptroller, that no appeal should be taken from this Court's decision relating to the years 1937–1939 which was entered on December 22, 1948. Absent any formal, or even informal, commitment to the Commissioner before January 1, 1949, that petitioner would not appeal from this Court's decision, such assertion by the petitioner is wholly self-serving and incompetent. Petitioner's officers had 3 months from December 22, 1948, within which to change their minds and file an appeal. At the most, it should be concluded that as of December 31, 1948, McCarthy's opinion that petitioner would not file an appeal was only tentative.

It appears that the majority view attaches far too much importance to the point that petitioner, before the end of 1948, transmitted checks to the collector of internal revenue for deficiencies and interest thereon for the years 1937 through 1942. In the letter of transmittal, petitioner did not state that it consented to the deficiencies and interest and that it would not appeal from this Court's decision pertaining to the earlier years. No consent forms were executed by petitioner before the end of 1948. It is not proper to regard the mere remittance of funds to the collector as an agreement or consent to liability, or as a commitment not to appeal. For example, a collector is not under any obligation to regard a remittance as a payment of taxes or interest. See *Lewyt Corp.* v. *Commissioner*, 215 F. 2d 518; and *Fred J. Arheit*, 31 T.C. 46.

Petitioner does not deny that if the respondent had filed appeal from this Court's decision, it would have filed a cross-appeal. The situation was fluid and undetermined as of December 31, 1948, whether there would be any appeal from this Court's decision, and it is both unrealistic and unpractical to conclude that as of the end of 1948 appeal was unlikely. The majority view errs in giving petitioner's evidence a value and weight which is not justified, and the conclusion reached improperly permits petitioner to choose the most advantageous year to it for accruing the item of interest for which it claims a deduction. The holding made here is not in harmony with the rule of *Dixie Pine Products Co.* v. *Commissioner*, 320 U.S. 516, and *Security Flour Mills Co.* v. *Commissioner*, 321 U.S. 281. Accrual and deduction in 1948 of interest on deficiencies for the years 1943–1947, inclusive, should not be allowed.

WITHEY, *J.*, dissenting: I am unable to concur with the majority on the first point. It seems clear to me that to the extent the employee Sheeran rendered extraordinary services to the petitioner the Commissioner has been generous in his allowance of deductions for amounts paid Sheeran's widow after his death. Additional amounts which have been allowed by the majority as deductions to the corporation could in fact be only gifts to the widow on the basis of the findings of fact. Being gifts they are not allowable as income tax deductions to petitioner unless they could be said to be a contract obligation. There is no such showing here and for that reason decision on the first issue should have been for the respondent.