**William S. GILLIS and Loretta L. Gillis**

**v.**

**UNITED STATES of America.**

**Civ. A. No. 65–B–57.**

United States District Court
S. D. Texas,
Brownsville Division.

Dec. 29, 1966.

Coneway & Forrester, Albert E. Coneway, Harlingen, Tex., for plaintiffs.

Mitchell Rogovin, Asst. Atty. Gen., Robert L. Waters, Washington, D. C., Robert L. Trimble, Fort Worth, Tex., Morton L. Susman, U. S. Atty., and John H. Baumgarten, Asst. U. S. Atty., Houston, Tex., for defendant.

## MEMORANDUM OPINION

GARZA, District Judge.

This is a suit for the recovery of federal income taxes and interest in the amount of $15,140.91 paid for the years 1957 and 1958.

The Plaintiff-Husband held a twenty-five per cent interest in the Vernon M. Murphy Cotton Company. The Vernon M. Murphy Cotton Company was a business partnership operating a cotton buying and selling business with the principal offices in Harlingen, Cameron County, Texas. The partnership operated on a fiscal taxable year beginning February 1st and continuing through January 31st of the subsequent year, and maintained and operated its business books and records on an accrual accounting basis, and filed its partnership income tax information returns on an accrual basis.

The Plaintiff taxpayers filed their personal income tax returns on a calendar year basis and included therein their twenty-five per cent portion of net income and/or net loss from the Vernon M. Murphy Cotton Company partnership as reflected on the partnership returns of that company.

The Internal Revenue Service, in auditing the return filed by the partnership, questioned certain deductions which the partnership made as accrued liabilities. This, in turn, necessitated changes in the personal income tax returns of the Plaintiffs here, which increased their tax liability for the years 1957 and 1958. The taxes as recomputed were paid, a claim for refund filed and denied, giving rise to this suit. The Plaintiffs' complaint is authorized by the Internal Revenue Code and it has been stipulated, and the Court finds, that it has jurisdiction of the subject-matter and of the parties.

Two questions are presented for the Court's determination, as follows:

1) In determining the Taxpayers' income for the years 1957 and 1958 from the Vernon M. Murphy Cotton Company, was the partnership entitled to claim as deductions accrued liabilities in the amount of $21,000.00 for the fiscal year ending January 31, 1957, and $55,987.50 for the fiscal year ending January 31, 1958, which amounts represented unfulfilled Commodity Credit Corporation export obligations on 700 bales of cotton for the partnership's fiscal year ending January 31, 1957, and 1,493 bales of cotton for the partnership's fiscal year ending January 31, 1958?

2) In determining the Taxpayers' income for the year 1958 from the Vernon M. Murphy Cotton Company, was the partnership entitled to deduct as an accrued liability the amount of $64,690.41 for the fiscal year ending January 31, 1958, which amount represents claims of a foreign purchaser involving the quality standards of cotton sold by the partnership during the fiscal year ending January 31, 1958?

The 1954 Internal Revenue Code (26 U.S.C. § 461) provides as follows:

SEC. 461. GENERAL RULE FOR TAXABLE YEAR OF DEDUCTION.

(a) *General Rule.*—The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income.

The Treasury Regulations on Income Tax under the 1954 Code, provide as follows:

SEC. 1.461.1. GENERAL RULE FOR TAXABLE YEAR OF DEDUCTION.

(a) *General Rule.*—

\* \* \* \* \* \*

(2) *Taxpayer using an accrual method.*—Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. \* \* \*

\* \* \* \* \* \*

To facilitate the understanding of the two questions presented to the Court, we will discuss them as the Commodity Credit Corporation (hereinafter referred to as CCC) Issue, and the Polish Cotton Issue.

## COMMODITY CREDIT CORPORATION ISSUE

The United States Government, to assure American farmers a fair return on their cotton crops and to assure a continuation of cotton production, initiated some years before the tax years involved here, a cotton price support program under which the farmer would deliver his cotton to the CCC and get a loan on the same at so much per pound. The farmer could later sell this cotton, or if he did not sell it by a certain time he would keep what was loaned him and his debt to the CCC which advanced the money would be canceled. Many farmers were satisfied with the money loaned by the CCC, which was always more than the actual price of the cotton in the world market, and CCC found itself with thousands of bales of cotton stored in its warehouses.

Beginning in 1956, and continuing through the years involved herein, the CCC conducted a cotton export program

under which it sold cotton to domestic cotton merchants, such as the Vernon M. Murphy Cotton Company, at prices lower than the domestic market price. A cotton merchant who bought from the CCC had to agree to export (1) the identical bales purchased, or (2) a like quantity of domestic cotton otherwise acquired by a prescribed deadline date, which deadline dates were July 31, 1957, for the year 1956, and July 31, 1958, for the year 1957. The obligation of the domestic cotton merchant to consummate said foreign sale and export was required by the CCC to be guaranteed by said merchant by the latter's depositing with CCC cash money or acceptable bond or acceptable letter of credit in an amount equivalent to at least $30.00 for each bale of the cotton originally purchased by the merchant from CCC. The Vernon M. Murphy Cotton Company used a performance bond to meet this obligation.

If the cotton merchant failed to export the same or other cotton within the time limit, he would have to pay the CCC an additional amount which would be the amount by which the amount originally paid the CCC was exceeded by (a) the domestic market price of such cotton, or (b) one hundred five per cent (105%) of the cotton export price plus reasonable carrying charges, whichever was higher.

A domestic cotton merchant participating in this CCC program could sell the cotton purchased from the CCC domestically and immediately realize a profit in an amount equivalent to the price at which the cotton was sold by CCC and the domestic price prevailing at the time of the purchase from CCC. However, the merchant would then have to go purchase cotton at the higher domestic price and resell it at foreign sale. Under these circumstances, a cotton merchant would have a "profit" sale and a "loss" sale.

The question presented here was due to the fact that the Vernon M. Murphy Cotton Company made its "profit" sale during its fiscal year which ended on January 31st, but did not make its "loss" sale until its following fiscal year, since the CCC allowed it to comply with its obligation of exporting American cotton by July 31st.

The Vernon M. Murphy Cotton Company, during its fiscal year of February 1, 1956, through January 31, 1957, purchased 700 bales of cotton from CCC at a price approximately $30.00 per bale below the then domestic price, and sold said cotton on the domestic market at the then domestic price, and included the cost of such purchase and sale in its income tax accounting for the fiscal year ending January 31, 1957. The Vernon M. Murphy Cotton Company, however, had deposited its bond with CCC at the time of the purchase, said bond being in the amount of $30.00 per bale for 700 bales, or $21,000.00. On its partnership return for the fiscal year ending January 31, 1957, it entered an accrued liability of $21,000.00 as an expense item of such amount against its income for such fiscal year. Between February 1, 1957, and July 31, 1957, the Vernon M. Murphy Cotton Company consummated the 700-bale foreign sale and export by purchasing the same on the domestic market and selling and exporting the same on the foreign market, incurring a loss of approximately $30.00 per bale, or $21,000.00, which amount was treated as a payment of the accrued liability in such amount for the fiscal year ending January 31, 1957, and was not included in the profit and loss accounting in the partnership income tax return for the partnership fiscal year ending January 31, 1958.

The Vernon M. Murphy Cotton Company, during its fiscal year of February 1, 1957, through January 31, 1958, purchased 1,493 bales of cotton from CCC at a price approximately $37.50 per bale below the then domestic price, and sold said cotton on the domestic market at the then domestic price, and included the cost of such purchase and sale in its income tax accounting for the fiscal year ending January 31, 1958.

The Vernon M. Murphy Cotton Company deposited its bond with CCC at the time of the purchase, which bond was

in the amount of $30.00 per bale for 1,493 bales, or $44,790.00. The partnership had not consummated its obligatory foreign sale and export of 1,493 bales of cotton by January 31, 1958, having until July 31, 1958, in which to do so. However, in its partnership return for its fiscal year ending January 31, 1958, it entered an accrued liability of $55,987.50 as an expense item of such amount against its income for such fiscal year, being 1,493 bales at $37.50 per bale.

Between February 1, 1958, and July 31, 1958, the partnership consummated the 1,493-bale foreign sale and export by purchasing the same on the domestic market and selling and exporting the same on the foreign market, incurring a loss of approximately $37.50 per bale, or approximately $55,987.50, which amount was treated as a payment of the accrued liability in such amount for the fiscal year ending January 31, 1958, and was not included in the profit and loss accounting of the partnership income tax return for the fiscal year ending January 31, 1959.

The Government contends that the partnership's unfulfilled obligation to the CCC at the end of the respective fiscal years to export cotton was a continuing and contingent liability which could not be taken into account in arriving at the partnership's income for these years under the provisions of § 446 of the 1954 Internal Revenue Code.

The Taxpayers, on the other hand, contend that the partnership was obligated by contract with CCC to consummate the "loss" sale in connection with the "profit" sale, and that this created a definite liability immediately ascertainable with reasonable accuracy, and that said liability was properly accounted on the partnership accounting records. They contend that the consummation of the "loss" sale by the partnership in the partnership's following fiscal year amounted to no more than paying a debt or obligation of the partnership actually incurred and accrued in the previous fiscal year.

There is no question that cotton merchants participating in the CCC foreign export program, if they sold the cotton received from CCC in foreign export, would sell the same for just about what they had paid for it, and if they bought other domestic cotton and shipped that in foreign export, they would suffer a loss amounting to approximately the deduction allowed by the CCC on cotton bought from them. The Government support price determined generally what the price of domestic cotton would be, and it was never more than one-half or one cent per pound above the loan value. Cotton merchants, such as the partnership involved here, work on the basis of trying to make around $1.00 to $2.50 for every bale they handle, and this is what induced cotton merchants, such as the Vernon M. Murphy Cotton Company, to participate in the program. Most cotton merchants, such as Vernon M. Murphy Cotton Company, when selling their "rights" to the domestic cotton bought from CCC would generally within a few days, and not more than three, enter into contracts to purchase domestic cotton for future delivery to comply with their obligation to export a like amount of bales before the deadline. The reduction in the price of cotton sold under this program by CCC was calculated to be the difference between the price of domestic cotton inflated by the support price of the Government and the true value of the same in the world market. If a cotton merchant, such as the Vernon M. Murphy Cotton Company, could not get about the same differential on its foreign sales because the world market price of cotton had gone down, they could elect not to comply with the contract and forfeit the bond and pay the penalty and adjustment provided for in the contract with the CCC. Therefore, there is no question that the "loss" sale above referred to could be reasonably ascertained long before the actual sale of the cotton in foreign export.

The Government cites to the Court the case of Ewing Thomas Converting Co. v. McCaughn, 43 F.2d 503, CA 3, as a

case sustaining their position and which they say has comparable facts. That case, however, is not controlling because there the taxpayer had breached a contract, and as stated by the Court in that case, did not see fit to complete the transaction within the year required by the contracts and unmistakably determine the loss, but was gambling with the market on the yarn that they had obligated themselves to deliver.

As said before, because of the price support paid by the Government, there was no possible gambling with the market in this case. If the world price of cotton went up, they would be making money and would have to report that on their tax return for the year in which they made the foreign sale; if the world price of cotton came down unreasonably, they could forego their foreign sale and pay the CCC under the bond which they had made.

■ As stated by Chief Justice Tuttle, of this Circuit, in Schuessler, et al. v. Commissioner of Internal Revenue, 230 F.2d 722, CA 5, 1956, what is sought by 26 U.S.C. § 461 and the Treasury Regulations thereunder is an accounting method that most accurately reflects the taxpayer's income on an annual accounting basis.

To hold with the Government on this issue would be to have a distortion of the income of the Vernon M. Murphy Cotton Company.

Judge Tuttle, in Schuessler v. Commissioner of Internal Revenue, supra, pointed out:

"The decisions of the Tax Court and of the several Courts of Appeals are not uniform on this subject, some circuits requiring a mathematical certainty as to the exact amount of the future expenditures that cannot be satisfied in the usual case. Other circuits, seemingly more concerned with the underlying principle of charging to each year's income reasonably ascertainable future expenses necessary to earn or retain the income, have permitted the accrual of restricted items of future expenses."

He then proceeds to quote from Harrold v. Commissioner, 192 F.2d 1002, at page 1006, by the Fourth Circuit, where the Court said:

" ' * * * when all the facts have occurred which determine that the taxpayer has incurred a liability in the tax year, and neither the fact nor the amount of the liability is contested, and the amount, although not definitely ascertained, is susceptible of estimate with reasonable accuracy in the tax year, deduction thereof from income may be taken by a taxpayer on an accrual basis.' "

The Government cites to the Court Gosho Cotton Company v. U. S., 215 F.Supp. 665 (D.C., 1962), as the only case involving CCC cotton and which they claim upholds their position here.

I do not believe the Gosho case is controlling, for in that case a cotton merchant, such as the Vernon M. Murphy Cotton Company, had purchased cotton from the CCC and made his "profit" sale, but his fiscal year ended before making a "loss" sale, and the taxpayer did not report his income from the "profit" sale in the year that he made it, but wanted to wait and report it in the year when he made his "loss" sale. He did not attempt to use an estimated loss on an accrual basis, such as the partnership involved here. The question in the Gosho case, from what Judge Davidson said, was the interest that the Government was claiming on the taxpayer's failure to include the $90,000.00 profit he made on his "profit" sale of the CCC cotton during the fiscal year that he made it in.

■ The amount of the loss in the sale of the domestic cotton in foreign export, or if not exported by the Vernon M. Murphy Cotton Company, the amount it would have to pay to the CCC under its bond, could be determined with reasonable accuracy, and being able to be so determined, the accounting method used by the partnership with regard

to the CCC cotton loss accurately reflected the taxpayers' income on an annual accounting basis. The partnership's action in deducting the loss on an accrual basis on its tax return was a reasonable action and not contrary to the requirements of the statute, and was in accord with the principle which has been recognized since United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347, was decided by the Supreme Court in 1926. The "all events" test first announced by the Supreme Court in that case has been amplified from time to time, and as amplified applies to the facts of this case. So on the CCC issue, the taxpayers must prevail.

## POLISH COTTON ISSUE

During the fiscal year ending January 31, 1958, the Vernon M. Murphy Cotton Company, by eight written contracts, sold 6,523 bales of Texas cotton to a Polish concern named Centrala Importowa Przemyslu Wlokiennlczeto Textilimport (hereinafter referred to as TEXTILIMPORT), whose offices were in the City of Lodz, Poland.

All the contracts were signed, all the cotton was shipped, and all payments for such cotton were received by the Vernon M. Murphy Cotton Company within the fiscal year ending January 31, 1958, although some 1,124 bales did not arrive in Poland until mid-February, 1958.

TEXTILIMPORT made payments for the cotton to the Vernon M. Murphy Cotton Company when the cotton was shipped from the United States, by multiplying the weight in pounds of the cotton by the price per pound agreed upon in the contracts. The contracts provided that if at the time TEXTILIMPORT received the cotton it did not meet the specifications of the contracts, TEXTILIMPORT would make claims against the partnership involved here.

Because of heavy rains in the Abilene, Texas, area where the Vernon M. Murphy Cotton Company had purchased the cotton to meet the contracts with TEXTILIMPORT, the Vernon M. Murphy Cotton Company knew at the time of the shipping of the cotton to Poland that the cotton did not match the quality and specifications called for in the contracts, and was certain that claims would be made against it by TEXTILIMPORT.

The partnership, in preparing its partnership return for the fiscal year ending January 31, 1958, entered the gross amounts received from TEXTILIMPORT as income, and claimed in that return an accrued liability in the amount of $64,609.41 as the anticipated claims of TEXTILIMPORT which they had determined would be the difference in the price paid and the price of the cotton actually shipped.

Twelve claims were made by TEXTILIMPORT. Four of these claims were paid by the Vernon M. Murphy Cotton Company as made by TEXTILIMPORT, without arbitration or other action thereon. The remaining eight claims were submitted to arbitration as provided for in the contracts with TEXTILIMPORT, and two of the arbitration findings were appealed by the Vernon M. Murphy Cotton Company to Havre. Those eight claims in amounts determined from such arbitration and appeal procedure were ultimately paid by the Vernon M. Murphy Cotton Company without further action in any other tribunal.

It should be noted that on eight of these claims, the Vernon M. Murphy Cotton Company rejected the claims of TEXTILIMPORT and forced them to arbitration, and two of the same were further appealed as has been noted above.

The arbitration and appeal awards were different in amounts both from the claims of TEXTILIMPORT and the amount that the Vernon M. Murphy Cotton Company contended was owed on the claims. Even after the arbitration and appeal awards were determined, the Vernon M. Murphy Cotton Company resisted payment of these amounts for over three years, and they were not ultimately paid as determined either by arbitration or appeal until after threat of court action.

The partnership, as has been noted above, calculated that the amount of

claims of TEXTILIMPORT would be $64,609.41. The amount in claims actually made by TEXTILIMPORT was $64,307.33. The amount actually paid to TEXTILIMPORT after the arbitration and appeal awards was $71,633.61. The Taxpayers urge that these figures show that they could determine their accrued liability with reasonable accuracy and that the "all events" test was met.

The fact still remains that at the time of the shipping of the cotton, the Vernon M. Murphy Cotton Company knew that they had not shipped the right cotton. They calculated that they owed TEXTILIMPORT $64,609.41, but yet made no attempt to tender that amount to TEXTILIMPORT, but awaited the filing of actual claims by TEXTILIMPORT, and even though their total claims were for less than they had calculated, they still chose the route of arbitration and appeal. This shows clearly that Vernon M. Murphy Cotton Company, even though realizing that in all probability they owed TEXTILIMPORT some money, were hoping that they could get by with shipping the cotton that they did ship, and were going to try and keep all the money received that they could. If the Vernon M. Murphy Cotton Company had tendered what they had calculated was their liability under the contracts to TEXTILIMPORT immediately, they might have a good cause to assert that they could take this amount off of their income for the fiscal year ending January 31, 1958. This they chose not to do.

From the facts before me, I find that Vernon M. Murphy Cotton Company in truth and in fact contested the majority of the claims of TEXTIL-IMPORT. Under these circumstances the partnership was not entitled to a deduction for the claims of TEXTILIMPORT, as under these facts they were contingent and unascertainable. Lucas v. American Code Co., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538; Dixie Pine Products Co. v. Commissioner, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270; Security Flour Mills Co. v. Commissioner, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725. See, also, Fifth Avenue Coach Lines, Inc. v. Commissioner, 31 T.C. 1080; affirmed, Commissioner v. Fifth Avenue Coach Lines, Inc., 2 Cir., 281 F.2d 556; cert. den. 366 U.S. 964, 81 S.Ct. 1915, 6 L.Ed.2d 1256.

In the last-cited case, even though the estimate made by the taxpayer was exactly the amount ultimately awarded in arbitration, the court still denied the deduction on the basis that the same had been contested.

Therefore, the Government must prevail on the Polish Cotton Issue.

The Internal Revenue Service, therefore, should have allowed the partnership to claim as deductions accrued liabilities in the amount of $21,000.00 for the fiscal year ending January 31, 1957, and $55,987.50 for the fiscal year ending January 31, 1958, which amounts represented unfulfilled CCC export obligations.

This Memorandum constitutes the Findings of Fact and Conclusions of Law of the Court in this matter.

The Clerk will file this Memorandum Opinion and send copies of the same to counsel of record.

The parties will prepare and present to the Court an appropriate judgment for entry.