Allen Industries, Inc. v. Commissioner.
Allen Industries, Inc. v. Commissioner
Docket No. 127-66.
United States Tax Court
T.C. Memo 1968-113; 1968 Tax Ct. Memo LEXIS 187; 27 T.C.M. (CCH) 542; T.C.M. (RIA) 68113; June 11, 1968. Filed Miles Jaffe and Howard K. Schwartz, for the petitioner. Joseph F Dillon, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: The Commissioner determined deficiencies of $19,066.65 and $9,533.32 in the income tax of petitioner for the *188 taxable years ended December 31, 1959, and December 31, 1960, respectively. The sole issue for decision is: Whether petitioner is entitled to deduct as an ordinary and necessary business expense under 543 section 162 of the 1954 Code [1] certain payments authorized by its board of directors and made to the widow of its former chairman of the board and chief executive officer. [2]
Findings of Fact Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by reference. Allen Industries, Inc., hereinafter referred to as the petitioner, is a corporation organized in 1927 under the laws of the State of Delaware. At the time it filed its petition herein, the petitioner's principal place of business was located in Detroit, *189 Mich. Petitioner filed its Federal income tax returns for the taxable years at issue with the district director of internal revenue at Detroit, Mich.
Petitioner, whose stock has been listed and traded on the New York Stock Exchange since 1937, is a manufacturer whose predominant products are automotive trim products, foam rubber padding and insulation materials. Some of its products are also used in the women's apparel and other industries. During both taxable years in issue, it had net sales in excess of $40,000,000 and employed approximately 3,000 persons at various manufacturing plants located throughout the United States. Approximately 400 employees were salaried while the others were paid on an hourly basis. Petitioner was founded by Joseph W. Allen and his sons, Sidney J. Allen (hereinafter referred to as Sidney) and Harold C. Allen. Sidney served continuously as petitioner's chairman of the board and chief executive officer from its inception in 1927 until his death on April 8, 1959. Sidney was a leader in petitioner's industry and he played the major role in developing petitioner between 1927 and 1959. Petitioner's major officers and directors held Sidney in high esteem *190 and felt that he was the primary contributor to the corporation's success. Prior to a board of directors' meeting on April 20, 1959, director Jerome J. Tobias (hereinafter referred to as Tobias) was president and general manager of petitioner and director Oscar A. Markus (hereinafter referred to as Markus) was executive vice president-treasurer. They discussed the possibility of taking some corporate action to recognize Sidney's contribution to the petitioner. To determine what other corporations had done in similar circumstances, Markus contacted the American Society of Corporate Secretaries and obtained a roster consisting of a number of large well-known public corporations listed on the New York Stock Exchange that had made payments to the widows of their deceased senior executive officers. Markus concluded that such payments were customary and appropriate under these circumstances. Petitioner always adequately compensated Sidney for his services while he was alive. His salary was $48,000 per year for the years 1955-1958 and $45,000 for 1954. In addition, he received bonuses for those years ranging in amounts from $28,000 to $35,000 per year. These bonuses represented Sidney's *191 contribution to the corporation during the respective year as evaluated by a committee of directors. Sidney's budgeted salary for 1959 was $55,500 of which he had earned $18,500 at the time of his death. On April 20, 1959, a special meeting of petitioner's board of directors was held at 10:00 a.m. during which Jay W. Allen, sidney's son, was elected to fill the vacancy on the board created by Sidney's death. At this meeting the board adopted a resolution expressing sympathy to Sidney's family. The resolution recognized his earthly achievements and his unsurpassed role in petitioner's corporate history. It reflected the sense of loss, admiration and appreciation felt by the board. At 11:00 a.m. on the same day the board held its annual meeting. The members at that time are listed below, with a description of the corporate office they then held and their relationship, if any, to the late Sidney: 544 *13 Members of the Board of Directors April 29, 1959
Name
Office
Relationship
Jerome J. Tobias
Chairman of the Board
None
Harold C. Allen
President and General Manager
Brother
Oscar A. Markus
Executive Vice President-Treasurer
None
David Schimmel
Vice President, Purchasing
None
Robert G. Olson
Vice President
None
Henry Kaufman
Vice President
Cousin
Jay W. Allen
None
Son
*192 Also present at this meeting were two of petitioner's tax consultants and an independent certified public accountant. Markus read the list of corporations making payments to widows of deceased executives to the board members. The board, after conferring with the tax consultants and the accountant as to wording, unanimously passed the following resolution: RESOLVED, That the sum of $55,000 be and the same hereby is authorized to be paid by the Corporation to Phyllis Z. Allen, widow of Sidney J. Allen who, at the time of his decease on April 8, 1959, was the Chairman of the Board of Directors of this Corporation, one of its founders and it chief executive officer since its inception, said sum to be paid to the said Mrs. Allen in equal monthly installments over the next twelve calendar months. The minutes recording this meeting at which the resolution was passed stated that the payments were voluntary. The record directly reflects the motives of all directors, except Robert G. Olson and Henry Kaufman, who were not called as witneesss, in voting for the resolution authorizing payments to Sidney's widow. They were primarily motivated by a desire to appropriately recognize Sidney's *193 long service and outstanding contribution to petitioner. None of these five directors felt any legal or moral obligations to make payments to Mrs. Allen. They did not view the authorized payments as compensation either to Sidney or his widow. They felt that the payments to Mrs. Allen were a gift. While directors Markus, Harold C. Allen, Jay W. Allen and David Schimmel (hereinafter referred to as Schimmel) felt that such payments also would enhance morale among petitioner's employees and would enhance petitioner's image generally, these were not motivating reasons behind their respective votes. Tobias did not consider such benefits at all. Schimmel, though he was unfamiliar with the widow's financial condition when Sidney died, thought the cash might help her through a difficult period. Markus, who had more knowledge regarding her assets, felt that Mrs. Allen was in good financial condition and not in need of financial help. The discussion among the directors preceding the authorization of the payments did not focus on or mention possible intangible business benefits resulting to the corporation from making the payments. It appears that the discussion consisted of little more than *194 the list of corporations read by Markus. Nor were the motives or feelings of the directors set forth in the two immediately preceding paragraphs expressed during the meeting. Mrs. Allen never rendered services to petitioner and she did not expect to receive the payments in issue, prior to the time she was told about the resolution. She was told that the payments were a gift from petitioner. Pursuant to the above-quoted resolution authorizing the $55,000 payment to Mrs. Allen, petitioner paid her $36,666.64 in 1959 and $18,333.32 in 1960 in 12 monthly installments of $4,583.33. The payments were made by checks charged to an unclassified account which was unrelated to petitioner's salary accounts. Petitioner did not withhold any Federal income or social security taxes, and did not furnish Mrs. Allen with a withholding form. There was no formal plan or undertaking to disseminate news concerning the payments to either the public or to the petitioner's employees and their wives, although after April 20, 1959, at least some of the employees heard of them informally by word of mouth. Although there was an announcement in petitioner's 1959 annual report to its shareholders that Sidney *195 had passed away, there was no mention of the payments. Payments in total amounts ranging from $1,000 to $10,000 have been made to survivors of deceased employees on three other occasions. All three employees were highly regarded but were considerably less valuable to petitioner than was Sidney. The 545 payments were made for a variety of nonbusiness reasons. One of these employees predeceased Sidney, and had been a salaried plant foreman. The other two survived Sidney and had been vice presidents but not members of the board of directors. One of these former vice presidents had resigned from petitioner, and was serving as a consultant to petitioner when he died. The other two were employees when they died. Payments in at least one of these instances did not come before the board of directors. Until Sidney's death no employee of his stature nor any major executive of petitioner had died while in office. Petitioner had no policy regarding payments to widows other than to deal with each situation as it arose. Nor was such a policy established after Sidney's death. While at least some of the officer-directors felt that the payments to Mrs. Allen set a precedent favoring payments *196 to their survivors in the event they died during their employment, all directors realized there was no corporate policy favoring such payments. They also knew that Sidney's case was unusual because of his unique and outstanding contribution to petitioner. Outside of specific contractual arrangements for payments to survivors instituted in 1963 or 1964 between certain employees and petitioner, there was no assurance of such payments or entitlement thereto. In addition to receiving the payments from which this dispute arises, Mrs. Allen elected to receive a lump sum distribution of $113,185.09 under Sidney's rights in petitioner's pension plan. The pension plan qualified under section 401(a). Petitioner received $150,601.94 as the beneficiary of two insurance policies on Sidney's life. Premiums on both policies were paid by petitioner. Such premiums were not deducted by petitioner for Federal income tax purposes. Of the 676,118 shares of petitioner's stock issued and outstanding as of April 20, 1959, the following individuals and estate owned the number specified of petitioner's shares: Name
Number of Shares
Harold C. Allen
22,797
Jay W. Allen
24,200
Phyllis Z. Allen
27,684
Robert G. Olson
5,272
Mrs. Robert G. Olson] married
31,875
Sidney's Estate
34,200
Henry Kaufman
1,633
*197 The matter of the tax treatment of these payments in Mrs. Allen's hands was the subject of an earlier action. Jay W. Allen, Tobias and Markus, as coexecutors of Sidney's estate, and Mrs. Allen filed Civil Action No. 24120 against the United States in the United States District Court for the Eastern District of Michigan, Southern Division, seeking a refund of taxes. The issue there was the includability of petitioner's payments to Mrs. Allen "in Plaintiffs' gross income." [3] Plaintiffs contended there that the payments to Mrs. Allen were a gift rather than income and, therefore, not includable in the return which Mrs. Allen filed jointly with the estate. Petitioner, as payor, deducted the payments to Mrs. Allen in computing its Federal income tax liability. The Commissioner, in his notice of deficiency, determined that such payments did not constitute allowable deductions under sections 162 and 404(a) (5) of the Code. Ultimate Finding of Fact Petitioner did not intend the payments to Mrs. *198 Allen to serve a business purpose or to result in the inurement of a business benefit. Opinion The only issue for decision is whether or not the payments to Mrs. Allen are deductible by petitioner. A statement of the issue and the major legal principles to be applied are accurately and helpfully set forth in Vesuvius Crucible Co., 24 T.C.M. 750, 751-752 (1965), affirmed 356 F. 2d 948 (C.A. 3, 1966). The pertinent excerpts follow: The sole question for decision is whether a payment by a corporation to the widow of a deceased officer constitutes a deductible expense of the corporation. The answer depends upon whether the payment involved qualifies as an ordinary and necessary expense of the corporate business within the purview of section 162 of the Internal Revenue Code of 1954. It is now accepted as basic that an expense may be ordinary, though unique to the taxpayer, if it is common to the business community of which he is a part. Welch v. Helvering, * * * 290 U.S. 111 (1933). In view of the multitude of cases involving payments to widows of corporate executives, it would be erroneous to presume that payments of *199 the kind here involved are not common to the business community of which 546 petitioner is a part. Consequently, the inquiry devolves into whether the payment under scrutiny was "necessary" within the judicially accepted meaning of that term. With a simplicity that is sometimes deceptive, the term necessary has been defined merely as appropriate and helpful. Welch v. Helvering, supra. Beyond this, we have said that while necessary does not mean indispensable, taxpayers seeking the benefit of a deduction under section 162 must show affirmatively not only that there are business ends to be served, but also that there is an intention to serve those business ends, by means of the questioned expenditure. This the taxpayer may do by demonstrating clearly that the payment was intended to result in the inurement of a business benefit. Interstate Drop Forge Co. v. Commissioner, * * * 326 F. 2d 743 (C.A. 7, 1964), affirming a Memorandum Opinion of this Court * * *. Additionally, in determining the corporation's tax consequences of payments to widows of deceased corporate officers, we are not concerned with the recipient's tax liability. Fifth Avenue Coach Lines, Inc., 31 T.C. 1080, 1093-1094 (1959), *200 acq. 1959-2 C.B. 4, reversed on other issues 281 F. 2d 556 (C.A. 2, 1960), certiorari denied 366 U.S. 964 (1961). Furthermore, although petitioner does not contend that the payments represented compensation for services performed by Sidney or Mrs. Allen, we may assume here that widow payments need not be compensation in order to be deductible. See Fifth Avenue Coach Lines, Inc., supra, at 1096; Interstate Drop Forge Co., T.C. Memo. 1963-149, affd. 326 F. 2d 743 (C.A. 7, 1964); cf. McLaughlin Gormley King Co., 11 T.C. 569, 575 (1948). The issue before us is, basically, one of fact. Vesuvius Crucible Co. v. Commissioner, 356 F. 2d 948 (C.A. 3, 1966), affirming a Memorandum Opinion of this Court. Petitioner must bear the burden of establishing the facts necessary to support its claim, Interstate Drop Forge Co. v. Commissioner, 326 F. 2d 743 (C.A. 7, 1964), affirming a Memorandum Opinion of this Court. Petitioner contends that the primary purpose of the payments was to materially enhance the humanization of petitioner's image, and thereby generate employee and customer *201 good-will. The testimony and exhibits, however, are directly contrary to petitioner's contentions. We find that the five directors, whose testimony is reflected in the record, were motivated primarily by the desire to recognize Sidney's contribution to petitioner. All seven members of petitioner's board of directors voted to make the payments. At least five directors felt no legal or moral obligation to Mrs. Allen. They felt the payments were gratuitous. The minutes of the meeting stated that the payments were voluntary. Markus, who drew the minutes, testified that they reflected the consensus of the board of directors. In sum, the payments were intended as a token of appreciation for Sidney's leadership and devotion to petitioner. Though possible business benefits were not discussed at the meeting, four of the directors testified that they had such benefits in mind when the resolution was passed. However, we conclude that their expectations of business benefits were not a moving factor behind their vote. Rather they seemed to have thought that some business benefit by the way of improved employee morale and an improved image in their business community might be a by-product of *202 their action of showing their appreciation of Sidney's dedication. Tobias, who succeeded Sidney as chairman of the board of directors, did not have such benefits in mind. His 1964 deposition, taken in connection with the suit by Mrs. Allen and the coexecutors for a refund of taxes paid on these payments, stated at page 9: Q In other words, there was no business benefit anticipated from these payments? A No. There was no thought of any such thing. In other words, this was a gift to a human that in my opinion was more than justified. Schimmel also stated at pages 6-7 of his 1964 deposition that his vote for the resolution was not motivated by such potential business benefits. We recognize a possible conflict between Schimmel's testimony in the 1964 tax refund case and his testimony during the trial of this case. We construe it to mean that while he was aware of possible business benefits, his vote was motivated primarily by a desire to show appreciation of Sidney and also to possibly assist his widow financially at a difficult time. 547 There was testimony that some of the directors felt that the payments to Mrs. Allen would tend to set a precedent for similar payments *203 to widows of other major executives. No policy or plan, however, was established along this line, and none existed at the time of trial. Each director who testified recognized that there was never such a policy and that the board of directors would probably consider each case as it occurred. [4]
*204 In 1963, or later, some of the executives obtained contractual arrangements with petitioner providing for similar payments to their widows. This hindsight merely confirms our view that no policy regarding such payments had been established earlier. Those testifying for petitioner, in looking back at the payments, felt that they had enhanced petitioner's corporate image. We think, however, that petitioner avoided exploitation of the payments to enhance its image. It did not attempt to inform either the public, its employees or the wives of its employees of the payments to Mrs. Allen. While the news certainly passed to some by word of mouth, this could hardly be called an attempt by petitioner to exploit its generosity. Even petitioner's annual report to its stockholders made no mention of the payments although there was an announcement of Sidney's death. The fact that the directors sought tax advice prior to adopting the resolution does not by itself evince an intent to obtain business benefits. From this record we cannot determine the advice requested or rendered. We shall not assume that the presence of the tax advisers indicates that petitioner wanted to handle the payments *205 in such a way as to gain the maximum tax advantage for petitioner. Although there is no evidence that the substantial stock holdings of Mrs. Allen, Sidney's estate and the Allen family influenced the authorization of the payments, the mere existence of such stock holdings warns us away from assuming that the directors sought the maximum tax benefits for petitioner. We have carefully examined and weighed the evidence, and have found that the material facts do not establish that the payments were a necessary business expense. While petitioner acted with the noblest of purposes, there was almost utter unconcern for obtaining possible business benefits from the payments. Therefore, we conclude that there was no intention for the questioned payments to serve business ends. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954. ↩
2. In the petition filed in this Court, the petitioner asserted that the payments are deductible under sections 162 and 404(a) (5). At the trial and on brief, petitioner asserted only that the payments are deductible under section 162 and, hence, we treat the issue of deductibility under section 404(a) (5)↩ as abandoned.
3. No other information is included in the stipulation of facts on which this statement is based, and no other details appear in the record except those recited after this statement.↩
4. Although petitioner had made one somewhat similar payment prior to Sidney's death and two thereafter, we cannot say there was a policy either to make such payments or to serve business purposes thereby. The employees involved were not comparable to Sidney nor regarded as comparable by the directors. The directors definitely did not vote as a board on one situation. Though the record is too unclear to warrant a finding, it indicates that they did not pass on the others. Also, Tobias testified in his 1964 deposition that these payments were not made for business reasons. Testimony by the other directors indicates motivation to assist needy survivors and to show appreciation for contributions to petitioner by means of gratuities. At any rate there is not sufficient evidence in this record to support a finding that these payments demonstrate a policy to serve business ends and that the payments to Mrs. Allen were an implementation of that policy.↩