Lewis & Taylor, Inc. v. Commissioner.
Lewis & Taylor, Inc. v. Commissioner
Docket No. 4605-66.
United States Tax Court
T.C. Memo 1969-82; 1969 Tax Ct. Memo LEXIS 216; 28 T.C.M. (CCH) 466; T.C.M. (RIA) 69082; April 22, 1969, Filed. Eugene J. Brenner and Thomas D. Roberts, 1920 Mills Tower, San Francisco, Calif., for the petitioner. James E. Merritt, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: [1] Respondent determined a deficiency of $2,186.96 in petitioner's income tax for the taxable year ending July 31, 1960. The sole issue for our determination after a concession by petitioner is whether $7,191.87 of payments totaling $17,500 to the estate of a deceased shareholder-officer-employee, made in the taxable year ending July 31, 1962, represents deductible compensation or a cost of acquiring stock. This deduction increased petitioner's loss for the *217 taxable year ending July 31, 1962, which petitioner has carried back to its taxable year ending July 31, 1960. Findings of Fact Some of the facts are stipulated and are found accordingly. Petitioner, a California corporation, maintained its principal place of business in San Francisco, California, at the time of filing the petition herein. Petitioner filed its Federal income tax returns for the period ending on July 31 of all relevant years with the district director of internal revenue, San Francisco, California. Lewis & Taylor, Inc., was formed by Edward Z. Lewis, Jr. (hereinafter Lewis) and George A. Taylor (hereinafter Taylor) in 1945 to perform cleaning maintenance services for office and other commercial buildings. Robert S. Abrons (hereinafter "Abrons") was employed by petitioner as its office manager in 1947. Until the time of his death in April 1961, *218 Abrons received the following amounts of salary and bonuses: Calendar Year
Salary
Bonus
Total
1947
$2,700.00
$ 2,700.00
1948
2,945.00
2,945.00
1949
3,400.00
3,400.00
1950
3,070.00
3,070.00
1951
3,000.00
3,000.00
1952
3,000.00
3,000.00
1953
5,250.00
$1,396.43
7,646.43
1954
6,000.00
6,000.00
1955
6,000.00
6,000.00
1956
$6,100.00
$ 300.00
$ 6,400.00
1957
6,800.00
600.00
7,400.00
1958
7,800.00
397.80
7,197.80
1959
7,800.00
325.00
8,125.00
1960
7,800.00
1,090.00
8,890.00
1961
2,666.00
2,666.00 The bonuses received by Abrons were paid pursuant to a discretionary plan established by petitioner's board of directors in 1953. Abrons' successors received no more than $600 per month in gross salary, exclusive of overtime and small Christmas bonuses, during the years 1961, 1962, and 1963. Abrons was a shareholder-officer at the time of his death. At that time, he owned 50 shares of petitioner's stock which he had acquired prior to 1952. Members of the Lewis or Taylor families owned the remaining 275 shares of petitioner's stock. Petitioner's shareholders executed a trusteed stock purchase agreement *219 in 1952, which provided for the purchase of the stock of a deceased shareholder by the remaining shareholders. The purchase price was to be agreed upon annually by the shareholders. The agreement provided for funding of at least a portion of the purchase price through life insurance. Petitioner and its shareholders entered into a new trusteed agreement in 1956, which provided for the purchase of the stock of a deceased shareholder at a price to be determined under a formula based upon book value, the net earnings for the period of the fiscal year preceding death, and billings to certain customers during the last preceding month-and-one-half. The purchase price was also funded at least in part by life insurance. This agreement provided in pertinent part: This Trust shall terminate automatically upon the expiration of any policies issued hereunder without value, or upon the bankruptcy or dissolution of the corporation, or by the mutual consent of the living stockholders, or upon the death of two stockholders after distribution has been made in compliance with the provisions of this agreement. 468 The term life insurance policies in effect at the time of execution of the 1956 *220 agreement on the lives of Edward Z. Lewis and George A. Taylor were surrendered in 1958 and 1959. Petitioner then purchased $25,000 policies from Phoenix Mutual Life Insurance Company on the lives of Lewis and Taylor, respectively, for the purpose of funding the stock purchase agreement. These policies, together with a $5,000 ordinary life policy on Abrons' life, taken out in 1951, were in effect at Abrons' death. Petitioner received payment of the proceeds of the $5,000 policy. Petitioner and its surviving shareholders executed a new agreement on June 1, 1961, which substituted the gross profit (gross sales less direct wages) of janitorial and window cleaning contracts for the three months preceding the shareholder's death for the one-and-one-half months of billing element in the formula under the 1956 agreement. The Crocker-Anglo National Bank, the executor of Abrons' estate, made a request for payment in accordance with the terms of the 1956 agreement. The purchase price of Abrons' stock under the formula set forth in that agreement equalled $22,321.50. Lewis and Taylor were of the view that the 1956 agreement had terminated because the term life insurance policies provided *221 for therein had expired. Petitioner, based upon the formula of the 1961 agreement and applied as of March 31, 1961, made a written offer of $17,191.87 to Abrons' estate for the 50 shares of stock held by the decedent. This offer was accepted by the executor of Abrons' estate, subject to the approval of the Superior Court. The terms of the sale were formalized by an agreement between petitioner and the executor for the sale of the 50 shares for $17,191.87 on September 29, 1961. Subsequently, petitioner, acting on the advice of its accountant, decided to seek a modification of the agreement so that $10,000 would be paid for the shares and $7,500 as additional compensation to Abrons ostensibly for past services rendered. The executor of the estate agreed and a new written agreement providing for the sale of the shares for $10,000 was executed on December 4, 1961. The additional $7,500 was paid on December 5, 1961. In January 1962, the Superior Court, acting as a probate court, authorized the sale of securities and confirmed the December 1961 contract. The following journal entry was made in the books of the petitioner as of May 31, 1961: Debit
JE 5-31-61 Treasury Stock - 50 Lewis & Taylor
$17,191.87
Estate of Robert S. Abrons re: Purchase of stock - 50 shares at 343.8374 per share
$17,191.87
Basis as follows:
Capital & Surplus per balance sheet sub- mitted March 31, 1961
$ 60,693.19
Gross Profits for Quarter ending 3-31-61 51,053.99
$111,747.18
50 shares at 343.8374
$ 17,191.87
Above offer made to Estate
*222 The book value of Abrons' shares as of March 31, 1961, was $9,337.50. The estate valued the shares at $10,000 in the inventory filed with the Superior Court. Petitioner never had any policy or plan for post-mortem distributions by way of compensation to deceased employees. Ultimate Finding of Fact $7,191.87 of the $17,500 paid by petitioner to Abrons' estate was part of the purchase price of decedent's shares and did not represent additional compensation to the decedent. Opinion The sole question herein is the proper treatment of a portion of an aggregate of $17,500 paid to the estate of Robert S. Abrons, a deceased shareholder-officer-employee of petitioner. Petitioner contends that $7,500 of this amount represents deductible additional compensation to Abrons and therefore a deductible expense under section 162(a)(1). [2] Respondent asserts that 469 $7,191.87 of this latter amount was paid for the decedent's shares of stock and therefore constitutes a nondeductible capital expenditure. We agree with respondent. Petitioner constructs its argument along the following lines: (1) the 1956 agreement with *223 respect to the purchase of shares of a deceased shareholder had terminated prior to Abrons' death, because of the alleged lapse of funding insurance; (2) there was therefore no obligation to purchase Abrons' shares; (3) the original 1961 agreement to pay $17,191.87 for these shares never became operative because it was not validly executed by petitioner and was not approved by the Superior Court; (4) the fair market value of the shares at Abrons' death was not in excess of $10,000; (5) as a consequence of the foregoing, the payment of the $7,500 under the modified 1961 arrangement was, in fact, as well as in form, additional compensation for services rendered by Abrons prior to his death and for which he had not been adequately compensated. We find this reasoning totally unpersuasive. In our opinion, the questions whether the 1956 agreement had vitality at Abrons' death, whether petitioner had any legal obligation to buy Abrons' shares, whether the original 1961 agreement was effective and whether the "fair market value" of those shares at Abrons' death was more or less than the amount paid are essentially irrelevant considerations. The critical question is what in fact were the *224 arrangements between petitioner and Abrons' estate. The answer, in a nutshell, is that petitioner simply purchased the Abrons' shares. Petitioner's offer of $17,191.87 was calculated in terms of what it thought the shares were worth. Under these circumstances. "fair market value" in the normal sense of what a third party might have paid for the shares is immaterial. Nor does any significance attach to the fact that the formula utilized was derived from a post-death agreement to which Abrons was not a party, particularly since that formula contained no element relating to compensation for past services. Moreover, we note that there is little, if any, evidence as to the extent or value of the services rendered to petitioner by Abrons. All that we know is that he worked long hours and that he was a faithful employee. Clearly, this is insufficient to equate the self-serving statements as to motivation with the fact of compensation. Cf. Fifth Avenue Coach Lines, Inc., 31 T.C. 1080 (1959); McLaughlin Gormley King Co., 11 T.C. 569 (1948); compare also William C. Atwater & Co., 10 T.C. 218, 244 (1948). Similarly, the record herein simply does not *225 bear out petitioner's contention that the $7,500 payment was related to maintenance of employee morale. There is no evidence that petitioner had any plan of post-death compensation payments; in fact, there is no indication of any other instance of any such payment. Finally, one cannot help wondering why, if the desire to compensate Abrons as an example to other employees was so important, it was not recognized at the outset when consideration was first given to purchasing the shares, rather than six months later after the tax benefit involved was discovered. Perhaps petitioner's directors were to some degree motivated by a feeling of regard for Abrons' faithful service and a sense of moral obligation stemming from his possible reliance on the continued effectiveness of the 1956 agreement. But, at most, this motivation reflected itself exclusively in the decision voluntarily to apply the 1961 formula in order to purchase Abrons' stock rather than to stand on legal rights and attempt to negotiate a better price. The December 1961 arrangements were no more than an after thought which bore no relationship to the actual situation and merely constructed a facade for a tax deduction. *226 To accept this facade, generated by a last-minute shift in signals, would be to ignore the realities herein and exalt form over substance - something petitioner itself agrees we should not do. Cf. Commissioner v. Court Holding Co., 324 U.S. 331 (1945); Waltham Netoco Theatres, Inc., 49 T.C. 399 (1968), affd., 401 F. 2d 333 (C.A. 1, 1968). On the record before us, the transmutation of a portion of the purchase price into an alleged payment of additional compensation is without any substantive significance. The fact that the agreement may have effected a novation under local law does not invalidate this conclusion. We hold that the $7,191.87 in dispute was paid for the acquisition of Abrons' share and is therefore a non-deductible 470 expense under section 162(a)(1). [3]Graybar Electric Co., 29 T.C. 818 (1958), affirmed per curiam 267 F. 2d 403 (C.A. 2, 1959); Standard Asbestos Mfg. & Insulating Co., 276 F. 2d 289 (C.A. 8, 1960), affirming a Memorandum Opinion of this Court on this issue; Warren Steam Pump Co., 13 B.T.A. 721 (1928). *227 Decision will be entered for the respondent. Footnotes
1. This case was heard by Judge Allin H. Pierce (Recalled) who has since retired from active duty with the Court. Prior to reassignment, each party was given an opportunity to submit a motion with respect thereto but no motion was filed. The case was assigned to Judge Theodore Tannenwald, Jr., on February 5, 1969.↩
2. All references are to the Internal Revenue Code of 1954.↩
3. Petitioner points to the fact that respondent did not disallow the entire $7,500 payment claimed to have been made as compensation for services. The fact that respondent may not have asserted the maximum disallowance provides no sustenance to petitioner's position.↩