M. Buten & Sons, Inc. v. Commissioner.
M. Buten & Sons, Inc. v. Commissioner
Docket No. 126-69.
United States Tax Court
T.C. Memo 1972-44; 1972 Tax Ct. Memo LEXIS 208; 31 T.C.M. (CCH) 178; T.C.M. (RIA) 72044; February 23, 1972, Filed. Thomas P. Glassmoyer, Robert A. Hanamirian, 1719 Packard Bldg., Philadelphia, Pa., and Fred L. Rosenbloom, for the petitioner. Alan E. Cobb, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined deficiencies in petitioner's income tax as follows: Taxable year
Deficiency asserted
1963
$1,176.42
1964
4,154.53
1965
604.46
Certain adjustments having been agreed to by the parties, only two issues remain for our consideration. [1]
(1) Whether amounts paid to the widow of a partner of petitioner's predecessor in interest under an agreement by petitioner to assume the predecessor's *210 outstanding liabilities were ordinary and necessary business expenses; and (2) Whether amounts paid to the widow of a director and officer of petitioner are deductible under section 162(a)[2] and section 404(a)(5). Findings of Fact The stipulation of facts and the exhibits attached thereto are incorporated herein by reference. M. Buten & Sons, Inc. (hereinafter referred to as "petitioner") is a Pennsylvania corporation formed on May 2, 1963 and engaged in the business of selling paint and related supplies, both wholesale and retail. Its principal office was located in Philadelphia, Pennsylvania, at the time of the filing of the petition herein. It filed its accrual basis corporate income tax return for the calendar years in question with the district director of internal revenue in Philadelphia, Pennsylvania. M. Buten and Sons (hereinafter referred to as the "partnership") was also engaged 179 in the business of selling paint and related supplies, both wholesale and retail, until May 3, 1963. On February 1, 1949, there were six partners: Isadore Buten (Isadore), Joshua S. Buten (Joshua), Mottie *211 Buten (Mottie), Harry M. Buten (Harry), Leonard Buten (Leonard), and Alexander Levin (Levin). [3]
The formal partnership agreement entered into on that date by the aforementioned persons provided, in part, as follows: 3. * * * (b) If the deceased partner shall leave a widow surviving him, there shall be paid to her a pension in an amount which shall be one-third (1/3d) the rate of the regular weekly and monthly sums the deceased partner was drawing at the time of his death, but excluding his share of profits distributable at the end of the fiscal year. The pension shall be paid for ten (10) years following the death of the deceased partner or for the life of the widow, whichever period shall be the shorter. If the partnership is terminated during the life of the widow and before the expiration of the ten (10) year period, the partners shall make suitable arrangements for the continuance of the pension or shall pay to the widow in a lump sum the full amount of pension which would remain payable to her assuming her survival for the balance of the ten *212 (10) year period. Among the partners, the pension payments thus provided for shall be treated as an expense of the partnership in determining net profit or loss in any fiscal year, and the obligation to arrange for continuance of the pension or to make the lump sum payment above specified on termination of the partnership shall, as against the surviving partners, be considered a debt due by the partnership. [4] * * * 7. A partner retiring from the firm shall not, for a period of five (5) years thereafter, directly or indirectly, for himself, or as agent or employe for any other person or persons, or through any other person or persons as his agent, employe, or otherwise, engage, or be an officer, director, shareholder, or employe of any corporation which shall engage in the business of buying, selling, or dealing in paints, glass, painters' supplies, or any commodities dealt in by the partnership, within a radius of twenty-five (25) miles of any store or place of business operated by the partnership; nor sell such commodities to any corporation, association, or person who at such time is or at any time prior thereto was a customer *213 of the partnership. He shall not trade under the firm name or make use of it in any way. Separate provision was made in the agreement with respect to payment for a partner's interest in the event of his death or retirement. In 1957, this agreement was amended, changing the percentages of each partner's share of the profits and providing for the creation of a capital account (and, eventually, a proprietary interest in the partnership) on behalf of four younger members of the family, who were also employees of the partnership: Herbert T. Picus (Picus), S. Ty Steinberg (Steinberg), Max Buten (Max), and Bernard Weiner (Weiner). [5]
On March 12, 1963, Mottie died, and the partnership became obligated to pay his widow, Fannie Buten, death benefits of $142 per week in accordance with the aforementioned agreement. [6] On April 5, 1963, Harry sold his interest in the partnership to Isadore and retired. As a result of the foregoing events and his *214 concern that the business was in a decline, Leonard entertained some doubts as to the desirability of continuing with the business. Leonard also believed that Steinberg, Picus, and Levin were hesitant about continuing with the family business. It was ultimately decided to continue the business, but in corporate form. Steinberg, who had been with the partnership since 1950, took Mottie's position as sales manager (a position he still held as of the time of trial), while Picus continued working in the areas of sales and color styling and generally assisting Steinberg. Levin, who was 58 or 59 years of age, continued as sales store supervisor (a position he had held since 1949) until his death on July 28, 1965. In 1949, the partnership operated between ten and twelve stores. From the time of incorporation until the time of trial, petitioner operated approximately twenty-five stores. Both the retail and wholesale aspects of the business were channelled through the stores. 180 On May 3, 1963, pursuant to *215 a preincorporation agreement, the assets of the partnership were transferred to petitioner in exchange for 696,571 shares of $1-par stock and the assumption by petitioner of the liabilities of the partnership, including liabilities on outstanding contracts. The stock so received was distributed as follows: Shareholder-Partner
Number of shares
Isadore
444,820
Joshua
189,752
Leonard
30,687
Levin
31,312
Total
[7] 696,571
The following people were elected by petitioner's board of directors to fill various corporate offices at the salaries indicated: Weekly
Person
Office
salary
Isadore
Chairman of the Board
$750
Joshua
Vice Chairman of the Board
325
Leonard
President
440
Levin
Executive Vice President
385
Steinberg
Vice President and Sales Manager
375
Max
Treasurer
225
Weiner
Controller
250
Picus
Secretary
250
David Buten
Asst. Secretary
170
The foregoing salaries were "subject to bonuses at the discretion of the Board" and the board further authorized the execution by petitioner of the stockholders' agreement *216 hereinafter referred to. On May 3, 1963, petitioner, Isadore, Joshua, Leonard, and Levin entered into a stockholders' agreement which provided, in part, as follows: 5. (a) Each Stockholder covenants and agrees that upon his ceasing to be active in the business of the Company he will not, for a period of three years thereafter, directly or indirectly, for himself, or through any other person or persons or otherwise engage in, or be an officer, director, shareholder, agent or employee of any enterprise which shall, as its principal business, engage in selling or dealing in paints, glass, painters' supplies and related commodities, within a radius of 25 miles of any store or place of business operated by the Company; provided, however, that nothing herein contained shall prohibit any such Stockholder from owning less than 10% of the outstanding stock of any class of any corporation whose stock is traded on a national securities exchange or listed in the daily sheets of the National Quotation Bureau, Inc. * * * 6. (a) If LORETTA BUTEN, the wife of Leonard Buten, shall be such at the time of his death, and if, at such time, Leonard Buten shall be employed by the Company, then the *217 Company shall pay to her the sum of $150 a week for the remainder of her life or for a period of 10 years from his death, whichever is the shorter, provided that as a condition of receiving such payments and in consideration therefor, LORETTA BUTEN shall agree in writing to be bound by the provisions of Section 5 hereof as though she were a Stockholder who had ceased being active in the business of the Company. (b) If ESTHER LEVIN, the wife of Alexander Levin, shall be such at the time of his death, and if, at such time, Alexander Levin shall be employed by the Company, then the Company shall pay her the sum of $150 a week for the remainder of her life or for a period of 10 years from his death, whichever is the shorter, provided that as a condition of receiving such payments and in consideration therefor, ESTHER LEVIN shall agree in writing to be bound by the provisions of Section 5 hereof as though she were a Stockholder who had ceased being active in the business of the Company. [8]
*218 All employees and shareholders, except Leonard and Levin were beneficiaries of a separate deferred compensation plan. At all times pertinent, Levin was ineligible to participate in the plan because of his age. Separate provisions were made for the disposition of a deceased shareholder's stock. Also on May 3, 1963, Fannie Buten (who was then 63 years of age) and petitioner entered into an agreement which provided, in part, as follows: WITNESSETH THAT: As of this date the Company acquired the assets of M. BUTEN AND SONS, a partnership (hereinafter referred to as the "partnership") subject to its liabilities, including a liability to FANNIE BUTEN by reason of the prior death of her husband, Mottie Buten, one of the partners of the partnership. 181 NOW, THEREFORE, intending to be legally bound, the parties have agreed as follows: 1. Company shall pay to FANNIE BUTEN the sum of $142 per week commencing forthwith such payments to continue until the death of FANNIE BUTEN or until April 4, 1973, whichever shall first occur. 2. In consideration of such payments: (a) FANNIE BUTEN covenants and agrees that she will not, as long as she is receiving such payments, directly *219 or indirectly, for herself or any other person or otherwise, engage in or become an officer, director, shareholder, agent or employe of any enterprise which shall, as its principal business, engage in selling or dealing in paints, glass, painter's supplies and related commodities within a radius of twenty-five miles of any store or place of business operated by Company; provided, however, that nothing herein contained shall prohibit FANNIE BUTEN from owning up to ten per cent of the outstanding stock of any corporation whose stock is traded on a National Securities Exchange or listed in the daily sheets of the National Quotation Bureau, Inc., and provided further, that the restrictions on FANNIE BUTEN set forth herein shall terminate forthwith in the event that either substantially all of the assets or a majority of the outstanding voting stock of the Company is transferred to persons who are not, by birth or marriage, members of the family of Max Buten, the founder of the business, or in the event either of FANNIE BUTEN'S sons-in-law, presently employes of the Company, shall be discharged with or without cause. The obligations of petitioner under the aforesaid agreement with Fannie *220 were personally guaranteed by Joshua, Leonard, Isadore, and Levin. On July 28, 1965, Levin died, and petitioner, in accordance with the shareholders' agreement, paid Levin's widow, Esther, $3,300 in 1965 at the rate of $150 per week. Levin had been a director and executive vice president of petitioner from its inception until his death. He had been connected with the business of the partnership since 1928. During the period from March 2, 1956 to May 3, 1963, Levin's weekly drawing was as follows: From
Amount
3/ 2/56 to 2/19/59
$280 per week
2/20/59 to 3/ 8/62
305 per week
3/ 9/62 to 4/11/63
435 per week
4/12/63 to 5/ 3/63
335 per week
His draw and share of the partnership profits from 1958 until incorporation in 1963 amounted to approximately $25,000 per year and, in the one full year that he was employed by the corporation, he received total compensation of $23,648.33. The corporation had net sales in excess of $4,000,000 in each of its taxable years 1964 and 1965 and in excess of $3,000,000 for the eight months of its existence in 1963. Ultimate Finding of Fact The payments made by petitioner to Esther Levin were reasonable and necessary business *221 expenses. Opinion Issue 1. Payments to Fannie In support of the deductibility of its payments to Fannie, petitioner first contends that if the payments would have been an ordinary and necessary business expense of the partnership, it necessarily follows that these payments should be deductible by petitioner as the partnership's successor-in-interest. We disagree. At the time of incorporation, Mottie had died and the obligation to Fannie had accrued and became fixed. The partnership agreement covering these payments provided that upon termination of the partnership, this obligation was to be treated as a debt of the partnership. Upon incorporation, petitioner agreed to assume all liabilities of the partnership, and the agreement with Fannie expressly states that this liability was assumed by petitioner. It is well settled that an expenditure of a preceding owner of property which has accrued but which is paid by one acquiring that property is a part of the cost of acquiring that property, irrespective of what would be the tax character of the expenditure to the prior owner. Such payment *222 becomes part of the basis of the property acquired and may not be deducted when paid by the acquirer of that property. United States v. Smith, 418 F. 2d 589, 596 (C.A. 5, 1969); Portland Gasoline Co. v. Commissioner, 181 F. 2d 538 (C.A. 5, 1950); W. D. Haden Co. v. Commissioner, 165 F. 2d 588, 591 (C.A. 5, 1948); Holdcroft Transp. Co. v. Commissioner, 153 F. 2d 323 (C.A. 8, 1946). See also Rodney, Inc. v. Commissioner, 145 F. 2d 692 (C.A. 2, 1944), affirming 2 T.C. 1020 (1943); Automatic 182 Sprinkler Co. of America, 27 B.T.A. 160 (1932). Petitioner next contends that it is entitled to amortize these payments as the cost of the non-competition agreement it entered into with Fannie. It is clear petitioner was obligated to make the payments in question without reference to the non-competition agreement and that no additional consideration passed to Fannie in exchange for the covenant. On this basis alone, petitioner must fail. Even if we assume arguendo that petitioner's preexisting obligation to make these payments to Fannie does not preclude the deduction, petitioner's position *223 must still be rejected. A non-competition covenant must have some independent basis in fact or some arguable relationship to the business involved so that reasonable men, genuinely concerned with their economic future, might bargain for such an undertaking. Levine v. Commissioner, 324 F. 2d 298, 302 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court; Schulz v. Commissioner, 294 F. 2d 52, 55 (C.A. 9, 1961), affirming 34 T.C. 235 (1960); George A. Nye, 50 T.C. 203, 218-219 (1968). The circumstances herein do not meet this minimum standard. We are not convinced that Picus and Steinberg were seriously thinking of leaving the business, nor are we persuaded that Fannie had the inclination or economic resources to compete or to finance competition with her brothers. In this respect, we note the conspicuous failure of Picus, Steinberg, and Fannie to testify on petitioner's behalf. See O. H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123 (C.A. 9, 1960); Douglas J. Lemery, 52 T.C. 367, 376 (1969), affirmed *224 per curiam, 451 F. 2d 173 (C.A. 9, 1971). Moreover, we find it odd, to say the least, that Fannie was restricted from competing with petitioner for a period of ten years, while an active corporate shareholder, who might leave the business voluntarily, was prohibited from competing with petitioner for only three years. In short, the covenant made with Fannie was without substance. Respondent's determination is upheld on this issue. Issue 2. Payments to Esther We now turn to the question of whether petitioner is entitled to deduct payments made to Levin's widow, Esther, in 1965. Both parties agree that the resolution of this question is governed by section 404(a)(5)[9] and section 1.404(a)-12, [10] Income Tax Regs.
*225 Petitioner contends that the payments were made to Levin's widow pursuant to an arm's-length agreement between petitioner and Levin and that the amount received (or to be received) by Levin's widow was reasonable in light of Levin's many years of service on behalf of the business. As a consequence, petitioner contends that the payments constituted ordinary and necessary business expenses. Respondent puts forth three alternative positions: (1) the provision in favor of Levin's widow, and the payments there-under, constituted part of petitioner's cost 183 of acquiring the assets of the partnership; (2) the agreement to provide for Esther was without business purpose and was motivated by Isadore's and Joshua's desire to provide for their sister's welfare in case of Levin's untimely death; and (3) even if petitioner was motivated by sound business reasons, the payments due Esther were excessive and unreasonable in amount. As is so often the case, there are elements present herein which lend some credence to all of the contentions of the parties. The question involved is essentially one of fact, and we recognize that *226 dealings between a closely-held corporation and its shareholders should be closely scrutinized. Anthony Mennuto, 56 T.C. 910 (1971). Levin had been in the continuous employ of petitioner or its predecessor for more than 35 years prior to his death. He was a key executive in the management structure of the partnership's business. As the partnership's successor, petitioner expected to derive a current benefit from Levin's services to the partnership, and it was reasonable for it to consider this factor when remunerating Levin. Cf. Republic Engineers, Inc., 54 T.C. 702, 704 (1970). The agreement keyed the payments to Esther to the condition that Levin be in petitioner's employ at the time of his death; the thrust of the provision was to provide sufficient incentive to Levin to continue with the business. Moreover, petitioner and its predecessor had a well-established policy of providing post-employment benefits for its employees and their beneficiaries, and it would have been conspicuously inconsistent with this policy had they failed to provide Levin with similar benefits. Finally, we note Levin's stock interest was small (less than 5%); that payment for *227 that interest was separately provided for, [11] that the annual payments approximated one-third of Levin's annual compensation at the time of his death; that the maximum period of payment was ten years; and that the total amount payable was about three times Levin's annual compensation. In light of Levin's long time connection with the business, the amount of the payments to Esther is, under the circumstances of this case, within the realm of reasonableness. [12]
*228 No doubt the close family ties between the majority shareholders and Levin's widow, Esther, were in the background of the undertaking by petitioner and may well have been a motivating factor. But, as we said in Fifth Avenue Coach Lines, Inc., 31 T.C. 1080, 1094 (1959), affirmed and reversed on other issues, 281 F. 2d 556 (C.A. 2, 1960), "[the] motives for making the payments here involved are ambiguous and multiple; such is often the case." On the basis of the record as a whole, we are satisfied that petitioner was principally motivated by its desire to keep Levin as an active employee for as long as possible, and the alleviation of his fears as to the future welfare of his wife was a legitimate way to accomplish that purpose. Compare John C. Nordt Co., 46 T.C. 431 (1966). Respondent's reliance on Frederick Pfeifer Corporation, 14 T.C. 569 (1950), is misplaced; that case is easily distinguishable on its facts. The record herein is not completely satisfactory. However, having weighed the evidence presented, we find that the agreement with respect to the payments to Esther was made for a substantial business purpose and *229 that the amount to be paid thereunder was not excessive or unreasonable. Decision will be entered under Rule 50. 184 Footnotes
1. Respondent disallowed a bad debt deduction for 1965 but petitioner presented no evidence as to this issue at trial. As a consequence, respondent's determination is sustained because of petitioner's failure of proof. Other issues, relating to taxes and contributions for 1964 and 1965, were not raised in the petition and are deemed to have been conceded by petitioner.↩
2. All references are to the Internal Revenue Code of 1954, as amended.↩
3. Isadore, Joshua, Mottie, and Harry were brothers, Levin was married to their sister, Esther, and Leonard was Isadore's son.↩
4. All six partners were married at this time.↩
5. Steinberg and Picus were Mottie's sons-in-law; Max was the son of Harry; and Weiner was married to Levin's daughter. For reasons not disclosed by the record, none of the four younger members of the family ever achieved partnership status.↩
6. Mottie's interest in the partnership was distributed to the remaining partners in accordance with the terms of the 1949 agreement, which terms are not relevant herein.↩
7. Later in 1963 Steinberg, Picus, Max, and Weiner were permitted to buy stock in petitioner.↩
8. At the time, Leonard and Levin were the only married stockholders. Isadore was a widower and Joshua was divorced. The latter two later remarried but the ageement was not amended to provide for similar payments to their wives.↩
9. SEC. 404. DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERRED-PAYMENT PLAN. (a) General Rule. - If * * * compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such * * * compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income) but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year: * * * (5) Other plans. - In the taxable year when paid, * * * if the employees' rights to or derived from such employer's contribution or such compensation are nonforfeitable at the time the contribution or compensation is paid. ↩
10. Sec. 1.404(a)-12 Contributions of an employer under a plan that does not meet the requirements of section 401(a); application of section 404(a)(5). Section 404(a)(5) covers all cases for which deductions are allowable under section 404(a) but not allowable under paragraphs (1), (2), (3), (4), or (7) of such section. * * * If unfunded pensions are paid directly to former employees, their rights to such payments are nonforfeitable, and accordingly, such amounts are deductible under section 404(a)(5) when paid. Similarly, if amounts are paid as a death benefit to the beneficiaries of an employee (for example, by continuing his salary for a reasonable period), and if such amounts meet the requirements of section 162 or 212, such amounts are deductible under section 404(a)(5) in any case when they are not deductible under the other paragraphs of section 404(a)↩. * * * If an amount is accrued but not paid during the taxable year, no deduction is allowable for such amount for such year. * * *
11. It appears that the formula, by which the amount of such payment was arrived at, did not take into account goodwill. But there is no evidence that any goodwill attached to petitioner's business and, in any event, respondent makes no argument that the payments in question herein represented goodwill.↩
12. Compare Fifth Avenue Coach Lines, Inc., 31 T.C. 1080, 1092-1096 (1959), affirmed and reversed on other issues, 281 F. 2d 556 (C.A. 2, 1960), where this Court allowed the deduction of payments of salary to a decedent employee's widow for 2 years and 7 months; I. Putnam, Inc., 15 T.C. 86, 92 (1950), where this Court, in allowing payments of such salary for 24 months, stated: "We think what is 'a limited period' within the meaning of the regulations [under the 1939 Code] will depend upon the facts of each particular case"; McLaughlin Gormley King Co., 11 T.C. 569 (1948), where a deduction of such salary for 29 months was allowed. See also Rev. Rul. 54-625, 1954-2 C.B. 85↩.